LaSHAWN A., et al., Plaintiffs,

v.

Sharon Pratt DIXON, et al.,
Defendants.

Civ. A. No. 89–1754.

United States District Court,
District of Columbia.

April 18, 1991.

Christopher Dunn, Marcia Lowry, Children's Rights Project, ACLU, New York City, for plaintiffs.

Eugene Adams, D.C. Office of Corp. Counsel, Washington, D.C., for defendants.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

This is a class action brought on behalf of children who are in foster care under the supervision of the District of Columbia Department of Human Services (DHS)[1] and children who, although not yet in the care of the DHS, are known to the department because of reported abuse or neglect.[2] It is a case about thousands of children who, due to family financial problems, psychological problems, and substance abuse problems, among other things, rely on the District to provide them with food, shelter, and day-to-day care. It is about beleaguered city employees trying their best to provide these necessities while plagued with excessive caseloads, staff shortages, and budgetary constraints. It is about the failures of an ineptly managed child welfare system, the indifference of the administration of the former mayor of the District of Columbia, Marion Barry, and the resultant tragedies for District children relegated to entire childhoods spent in foster care drift. Unfortunately, it is about a lost generation of children whose tragic plight is being repeated every day.

The complaint in this case alleges both statutory and constitutional violations in the administration of the District's foster care system. These allegations include the failure of the DHS to initiate timely investigations into reports of abuse or neglect, the failure to provide services to families to prevent the placement of children in foster care, the failure to place those who may not safely remain at home in appropriate foster homes and institutions, the failure to develop case plans for children in foster care, and the failure to move children into a situation of permanency, whether by returning them to their homes or freeing them for adoption.

In over two weeks of trial, this Court heard testimony about the system's deficiencies from a vast array of witnesses, including experts in child welfare and child psychiatry, social workers and managers at the DHS, foster and adoptive parents, and the parent of two children who spent several years in the District's custody. The Court has before it over a thousand District admissions confirming many of the plaintiff class' allegations. The inescapable conclusion is that the foster care sys-

---

1. The DHS is the District's umbrella social services agency. Within it are three commissions, including the Commission on Social Services (CSS). Within the CSS are five administrations, including the Family Services Administration (FSA). Within the FSA are three divisions, including the Child and Family Services Division (CFSD), which has the primary responsibility for the implementation and administration of the child welfare system within the District, including the foster care system.

2. Because several of the original defendants, including former mayor Marion Barry, no longer hold office in the District of Columbia government, the Court is *sua sponte* substituting the current officials, including Mayor Sharon Pratt Dixon, as defendants.

tem operated by the DHS does not comply with federal law, District law, or, for those plaintiffs in the District's foster care, the United States Constitution. Defense counsel has argued that public institutions cannot solve the problems brought about by poverty, neglect, and abuse until society addresses their causes. Plaintiffs have not asked for a "perfect world," however, they merely request compliance with statutory and constitutional requirements and they ask not to be harmed while in the District's custody. Mindful of the uncomfortable position in which the Court is placed by entertaining such a challenge to local government action, it is nevertheless compelled by the evidence to enter a judgment of liability against the defendant officials.[3] The Court shall defer ordering specific injunctive relief until after further briefing and argument by the parties.

## I.

## THE STATUTORY FRAMEWORK

Plaintiffs' complaint alleges that the District's practices in administering the city's foster care system violate numerous provisions of federal and District statutes. The federal statutes allegedly violated are the Adoption Assistance and Child Welfare Act of 1980, Pub.L. No. 96–272, 94 Stat. 516 (June 17, 1980) (codified as amended at 42 U.S.C. §§ 620–627 and §§ 670–679) (Adoption Assistance Act) and the Child Abuse Prevention and Treatment Act, Pub.L. No. 93–247, 88 Stat. 4 (January 31, 1974) (codified as amended at 42 U.S.C. §§ 5101–5106) (Abuse Prevention Act). The District statutes allegedly violated are the Prevention of Child Abuse and Neglect Act of 1977, D.C.Law 2–22 (Sept. 23, 1977) (codified as amended at D.C.Code Ann. §§ 2–1351 to –1357, §§ 6–2101 to –2107, §§ 6–2121 to –2127, and §§ 16–2351 to –2365) (Abuse and Neglect Act) and the Youth Residential Facilities Licensure Act of 1986, D.C.Law 6–139 (Aug. 13, 1986) (codified as amended

at D.C.Code Ann. §§ 3–801 to –808) (Licensure Act). Plaintiffs' complaint also alleges violations of the Child and Family Services Division (CFSD) Manual of Operations (September 1985) and reasonable professional child welfare standards.

### A. Abuse and Neglect

The federal Abuse Prevention Act and the District's Abuse and Neglect Act both deal with the investigation of reports of abuse and neglect and the provision of services to families for whom reports are substantiated. The District law establishes a 24–hour intake unit within the CFSD, the function of which is to receive reports of abuse and neglect and respond with investigations and emergency services. D.C.Code Ann. § 6–2122(e). The federal law requires "prompt" investigations, 42 U.S.C. § 5106a(b)(2), whereas the District law requires investigations "within 24 hours of the receipt of the report." D.C.Code Ann. § 6–2102(b). The purpose of the investigations, according to District law, is to determine the nature and extent of the abuse or neglect, the person responsible for the abuse or neglect, the conditions in the home, and whether the health or safety of the children in the home are in jeopardy. D.C.Code Ann. § 6–2104. Both federal and District law require the DHS to take whatever steps are necessary to protect the health and welfare of a child for whom a report has been made. These steps may include providing emergency services so that the child may remain in the home, or removing the child and placing him or her in temporary care if the provision of services could not adequately protect the child. 42 U.S.C. § 5106a(b)(2) & (b)(3); D.C.Code Ann. § 6–2105 & § 6–2124. Federal law requires "reasonable efforts" to prevent the removal of a child from the home or to return the child to the home if removal is necessary. Adoption Assistance Act, 42 U.S.C. § 671(a)(15). District law similarly requires the CFSD to develop a plan for

---

**3.** The defendants in this action, all of whom are sued in their official capacities, are Sharon Pratt Dixon, mayor of the District of Columbia; Vincent Gray, director of the Department of Human Services; Barbara Burke–Tatum, commis-sioner of the Commission on Social Services; Elizabeth Parker, acting administrator of the Family Services Administration; and Evelyn Andrews, chief of the Child and Family Services Division.

providing services to prevent the child's removal from the home or facilitate the child's return to the home if removal is unavoidable. D.C.Code Ann. § 6–2107. Finally, District law requires that if the child is removed from the home as a result of the investigation, within 90 days of removal the DHS shall either return the child to the home or request the filing of a neglect petition in the Family Division of the Superior Court of the District of Columbia. D.C.Code Ann. § 6–2123.

## B.  Continuing Services

The federal Adoption Assistance Act and the District's Abuse and Neglect Act include provisions on placing children in foster care, preparing case plans, providing continuing services to children and their natural and foster parents, periodically reviewing the necessity and appropriateness of placements, recruiting adoptive families, and maintaining a system that comports with professional standards.

### 1.  *Placements*

There are five ways a child may come into the custody of the DHS. The first is through voluntary placement, by which the child's parent or guardian voluntarily requests a temporary placement not to exceed 90 days. Before a child is taken into placement, a variety of in-home services directed at maintaining the child in the home must be offered or considered. CFSD Manual of Operations at § 601.1. Other methods of bringing a child into the custody of the DHS are through voluntary relinquishment of parental rights, *see id.* at § 601.2, temporary shelter care while a court action is pending, *see id.* at § 601.3, protective custody when a child has been left alone or with inadequate supervision, *see id.* at § 601.4, and police hold when a law enforcement officer has reason to believe the child is in immediate danger and removal is necessary. *See id.* § 601.5.

With respect to voluntary placements, also referred to as "emergency care" by the DHS officials, District law requires the CFSD to return the child to the home or request the filing of a neglect petition in the Family Division of the District of Columbia Superior Court within 90 days of placement. D.C.Code Ann. § 6–2123(a)(2). Federal law requires return to the home within 180 days unless there has been a judicial determination that placement is in the best interests of the child. 42 U.S.C. § 672(e).

Federal law requires that children for whom placement is necessary be placed in "the least restrictive (most family like) setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child." 42 U.S.C. § 675(5)(A). *See also* CFSD Manual of Operations at § 602.5(a). Additionally, federal law requires that all foster homes and institutions receiving federal funds meet standards "reasonably in accord with recommended standards of national organizations concerned with standards for such institutions or homes, including standards related to admission policies, safety, sanitation, and protection of civil rights." 42 U.S.C. § 671(a)(10).

### 2.  *Case Plans*

Federal regulations require social workers to prepare written case plans within 60 days of the assumption of responsibility for a child. 45 C.F.R. § 1356.21(d)(2). Similarly, District law provides that case plans be prepared "as soon as possible" for children for whom there has been a substantiated report of abuse or neglect. D.C.Code Ann. § 6–2107(b). This requirement is expanded upon in the CFSD Manual of Operations, which mandates a case plan within 45 days of the child's entry into care or within 30 days if the child has been voluntarily placed in care. CFSD Manual of Operations at § 401.2(a). To be in compliance with federal law, a case plan must contain a description of the home or institution in which the child is to be placed and a discussion of the appropriateness of such a placement. Additionally, the plan must set forth the agency's intentions for carrying out the voluntary placement agreement or judicial determination that resulted in the

child's placement in foster care.[4] The plan must also include a program for providing services to the child and his or her natural and foster parents, with the goal of either returning the child to the home or permanently placing the child. The plan must further detail the services necessary to address the child's needs while in foster care and must discuss the appropriateness of the services that have been provided. Finally, the plan must include the health and educational records of the child, to the extent those records are available and accessible. 42 U.S.C. § 675(1).

The District's Abuse and Neglect Act requires similar information to be included in case plans and requires specific arrangements for the management of each case for which protective services are required. D.C.Code Ann. § 6–2107(b). The CFSD Manual of Operations is more specific, requiring case plans to include the reasons for placement, the goal for the child and the date it is to be achieved, the reasons for the choice of the goal, and the changes necessary to achieve the goal. CFSD Manual of Operations at § 401.2(h). Case plans must also include a visitation schedule specifying who will visit, how frequently visits will take place, where the visits will occur, and whether any conditions of supervision will apply. *Id.*[5]

### 3. *Providing Services*

The Adoption Assistance Act requires agencies to provide "proper care" to children in their custody and to provide services intended to facilitate the return of the child to the home or to place the child in a permanent family. 42 U.S.C. § 675(1) and

§ 627(a)(2)(C). The District's Abuse and Neglect Act contains similar requirements. *See* D.C.Code Ann. § 6–2107(b), § 6–2123(a)(3), and § 6–2124. The services that the CFSD is authorized to provide include emergency financial aid, temporary third-party placement with neighbors or relatives, emergency caretaker services, homemaker services, day care, counseling, medical services, and other appropriate services available in the community. D.C. Code Ann. § 6–2124.

### 4. *Periodic Reviews*

Both federal and District law require periodic judicial or administrative reviews of the status of children in foster care. Federal law requires reviews at least every six months by either a court or administrative panel. The purpose of the reviews is to "determine the continuing necessity for and appropriateness of the placement, the extent of compliance with the case plan, and the extent of progress which has been made toward alleviating or mitigating the causes necessitating placement in foster care, and to project a likely date by which the child may be returned to the home or placed for adoption or legal guardianship." 42 U.S.C. § 675(5)(B).[6] District law similarly provides that, once a child has been adjudicated as neglected, the Family Division of the Superior Court shall hold a review hearing every six months unless the child is over the age of six and has been in custody for longer than two years. D.C. Code Ann. § 16–2323(a).

### 5. *Adoption*

Federal law contemplates adoption for those children who cannot be returned

---

**4.** Under the Adoption Assistance Act, states receiving federal monies under the Act must make foster care maintenance payments on behalf of children who are removed from the home as a result of either a voluntary placement agreement entered into by the child's parent or legal guardian or a judicial determination that remaining in the home would be contrary to the child's welfare and reasonable efforts to prevent placement have been made. 42 U.S.C. § 672(a)(1).

**5.** The District's laws governing proceedings in the Family Division of the District of Columbia Superior Court parallel the case plan require-

ments. These laws require a report to the court including a plan for providing protective services, the estimated time in which the goals of intervention may be achieved, and, if the child is in placement, the reasons why the child cannot be protected in the home and the plans for maximizing contact between the parent and child while the child is in placement. D.C.Code Ann. § 16–2319(c).

**6.** Federal law also requires a dispositional hearing no later than 18 months after the original placement, to determine the future status of the child. 42 U.S.C. § 675(5)(C).

home after services have been provided. 42 U.S.C. § 627(a)(2)(B) & § 675(5)(B). District law is more specific, requiring the CFSD to "prepare a permanent plan for the child" when rehabilitative services fail to result in reuniting the child with his family within a reasonable time. D.C.Code Ann. § 6–2123(b)(2). District law also provides that when parental rights are terminated and a child is freed for adoption, the CFSD shall seek prompt adoptive placement. If no placement is made within three months, the CFSD shall list the child on all appropriate adoption exchanges. If no placement is made within six months, the CFSD shall report to the Court on its efforts to secure an adoptive placement. D.C.Code Ann. § 16–2360(b).

The CFSD's policy manual contains further requirements for recruiting adoptive families. The manual provides that, even when a child is not legally freed for adoption, his or her case must be referred to the Adoption and Placement Resources Branch of the CFSD within three days of the selection of adoption as a goal for the child. CFSD Manual of Operations at § 703.3.

### 6. System Infrastructure

With respect to the general infrastructure of the child welfare system in the District, both federal and local law have certain requirements: Federal law requires the District to maintain an information system from which the status, location, and goals for the placement of all foster care children may be readily determined. 42 U.S.C. § 627(a)(2)(A). District law requires the maintenance of a Child Protection Register to index cases of abused and neglected children and assist in the treatment of those children. D.C.Code Ann. § 6–2111. District law also requires the CFSD to have "sufficient staff, supervisory personnel, and resources to accomplish the purposes of [the Abuse and Neglect Act], including the capacity to provide emergency and continuing service resources to abused and neglected children and their families." *Id.* at § 6–2122(c). Moreover, District law requires the staff qualifications, caseload levels, and supervision requirements of the CFSD to be guided by the standards set

out by the Child Welfare League of America or other child welfare organizations. *Id.* at § 6–2122(d).

### C. Licensure of Foster Homes and Institutions

The District's Licensure Act requires every facility providing foster care in the District to be licensed and inspected annually. D.C.Code Ann. § 3–802 and § 3–805(a)(1). Facilities caring for District children outside the District must be inspected at least once a year. *Id.* at § 3–805(a)(2).

### II.

### THE EVIDENCE PRESENTED AND THE COURT'S FINDINGS OF FACT

The Court was presented with various types of evidence during the lengthy trial of this case. First, the Court had before it over a thousand stipulated facts. Second, the Court was presented with several reports and case studies prepared by experts in the areas of child welfare policy and practice, social service methodology and research, the types and uses of automated information in public services programs, and the financing, administration, and delivery of human services. Third, the Court heard testimony from child psychiatrists, foster, adoptive, and natural parents, and employees of the DHS ranging from frontline social workers to upper-level management. After explaining more fully the nature of the expert evidence presented, the Court will make its findings of fact.

### A. The Nature of the Expert Evidence

#### 1. Walker Case Review

The complaint in this case names seven children as plaintiffs on behalf of the class. Their stories, according to plaintiffs, are representative of the stories of countless other children who have spent time in the District's foster care system. Introduced as evidence in this case is a report prepared by Clarice Dribble Walker, an expert in the field of child welfare policies and practices and an associate professor of social work

at Howard University in Washington, D.C.[7] For purposes of this litigation, Professor Walker prepared a "Case Review" of the case records of each of the named plaintiffs and the extent to which those records are in compliance with federal and District law and national professional standards (the Walker Report). Professor Walker based the report on her examination of the case records maintained by the DHS, as well as on deposition transcripts, reports by other experts in the field, and DHS documents, including the CFSD Manual of Operations. Professor Walker reviewed the cases in the context of her knowledge of the federal Adoption Assistance Act and Abuse Prevention Act and the District's Abuse and Neglect Act. The Walker Report details the experiences of each of the named plaintiffs in the District's foster care system, the social work and legal issues related to each, and the systemic problems identified in providing services to each of the children. The report concludes that the DHS has not complied with "the legal and social work mandate for permanency planning for children in the child welfare system," Walker Report at 5, because it has failed to make appropriate placements, set appropriate goals for children in placement, provide services toward the achievement of those goals, and move children through the system quickly so that they may obtain permanency by either returning home or being adopted.

#### 2. *Stein Case Reading*

Serving as the basis for many of plaintiffs' allegations about the widespread and systemic deficiencies in the District's foster care system is a Case Reading prepared by Theodore J. Stein, Ph.D., an expert in the fields of child welfare policy and practices and social science methodology and research (the Stein Report). Dr. Stein is a professor of social welfare at the State University of New York at Albany, where he has taught courses including "Child Welfare: Policy and Practice," "Research and Quantitative Methods," and "Law and Social Work." He has conducted six "case readings" since the passage of the federal Adoption Assistance Act and is currently working on another.[8]

Dr. Stein's case reading consisted of a review of a random sample of 675 case records for children in custody or formerly in the custody of the DHS and children who had been the subject of an investigation into a report of abuse or neglect.[9] This random sampling represents approximately 25 percent of the cases of children in foster care in the District, a figure that Dr. Stein testified is compatible with accepted scientific methodology.[10] The cases for review were selected using a table of random numbers.

---

7. Professor Walker also serves as chairperson for the direct services clinic at Howard University's School of Social Work. By virtue of this position, she is familiar with the policies and practices of the CFSD. Additionally, Professor Walker has served for 20 years as the senior consultant on child welfare issues for the National Black Child Development Institute. In 1989 she authored a study funded by the Skillman Foundation on the interventions and outcomes for black children entering foster care in 1986 in five cities across the country. Currently, Professor Walker serves on the Foster Care Commission of the Child Welfare League of America.

8. Dr. Stein's professional accomplishments also include having published 24 articles and six books in the area of child welfare and presented numerous papers at professional conferences throughout the country. Dr. Stein has conducted numerous multi-state studies of various aspects of child welfare, many of which have been funded through federal grants. Dr. Stein has served as a consultant on child welfare policy for the American Bar Association, the United Kingdom, the state of New Mexico, the city of Philadelphia, and the state of Illinois, among others. His work for the state of New Mexico included developing a plan for the implementation of a federal court order regarding the state's child welfare system.

9. Eighty percent of the sample records were for children in foster care or who had been in foster care in the year prior to the case reading. Nineteen percent were for children who had been the subject of an investigation. One percent was for children who had never actually been removed from their homes, although the DHS had reported them as being in foster care.

10. Dr. Stein did not review a set percentage of cases of children who had been the subject of an abuse or neglect investigation, but reviewed a set number—127—of such cases.

The case review was intended to assess the District's compliance with the requirements of the federal and local statutes, the CFSD Manual of Operations, and relevant professional standards such as those of the Child Welfare League of America. To accomplish this end, Dr. Stein developed a case reading instrument broken down into 11 sections: four dealing with case plans; two with investigations of abuse and neglect; two with case reviews; one for demographic information; one for medical, psychological/psychiatric, and educational history; and one covering the monitoring of foster care and institutional facilities by the CFSD. The case reading instrument consisted of 99 pages and 178 multi-part questions. Two full-time supervisors and 18 full-time case readers assisted Dr. Stein with the case review. The case readers spent three days in training on how to use the case reading instrument and the case reading guidelines. Dr. Stein conducted two reliability tests throughout the course of the case reading, the first yielding 94 percent reliability and the second yielding 95 percent reliability. Data from the case reading instruments was entered into computers by six staff members hired for the project. Data entry was also tested for reliability, which was determined to be 99 percent.

Once the data from the case reading instruments was entered, Dr. Stein analyzed the data. His findings are broken down into eight areas making up Volume I of the case reading. These areas are: demographic information about the sample; information regarding abuse and neglect investigations; information describing case planning and service provision for children in foster care with plans of either return home, adoption, independent living, or continued foster care; information regarding medical, dental, psychiatric/psychological services, and educational progress; information on administrative and judicial reviews; and information on the monitoring of foster homes and institutions. Volume II of the case reading includes detailed case examples illustrating the findings reported in Volume I. Based on these findings and examples, Dr. Stein concluded in his report and in testimony before this Court that, at the time of the case reading in early 1990, the District's foster care system was operating in much the same way as other jurisdictions had operated prior to the passage of the federal Adoption Assistance Act in 1980: as a holding system for children. Very few District children receive services to prevent their placement in foster care. Thirty-seven percent of children in the District's foster care system have been in care for four or more years and 62 percent do not have written case plans. Stein Report at 195. As a wrap-up to Dr. Stein's direct testimony at trial, he emphasized his conclusions by stating that he had not seen a system in the last eight to ten years that had made so little progress since the passage of the federal Adoption Assistance Act.

### 3. Center for the Study of Social Policy Report

In addition to the Walker and Stein Reports, plaintiffs introduced into evidence a report prepared by the Center for the Study of Social Policy (the Center), entitled *Children and Family Services in the District of Columbia* (September 1990) (Center Report), and consisting of an analysis of the District's child welfare system and recommendations for its improvement.[11] The Center is a nonprofit organization, based in Washington, D.C., that conducts policy research and analysis and provides technical assistance to state and local governments in various areas of human services, including child welfare. In the area of child welfare, the Center has directed comprehensive child welfare reform initiatives in three states and has provided direct technical assistance to over 20 states with respect to the financing, administration, and design of children's policies and

---

**11.** Plaintiffs originally moved to have members of the Center's staff appointed as independent experts under rule 706 of the Federal Rules of Evidence. When this motion was denied, plaintiffs engaged the Center staff to prepare the report that was ultimately entered into evidence.

programs. The Center staff consists of numerous professionals in the human services field and many specialists in child welfare policy. Testifying as experts during the trial of this case were three Center staff members who contributed to the report: Frank Farrow, Director of Children's Services Policy at the Center and former Executive Director of the Social Services Administration of the Maryland Department of Human Resources; Carol Wilson Williams, Ph.D., a senior research analyst at the Center and former professor of social work at the University of North Carolina and the University of California at Los Angeles; and Judith Meltzer, a senior research associate at the Center who specializes in federal entitlements funding under the Adoption Assistance Act and has offered technical assistance to a number of states regarding maximizing their federal reimbursements under the Act.[12]

The Center's report was prepared with two goals: to independently analyze the alleged deficiencies in the District's child welfare system and to propose concrete, feasible remedies for the future. The report analyzes the system in relation to the requirements of federal and District law, DHS and CFSD policies, and generally accepted professional child welfare practice. To conduct its analysis, the Center staff extensively reviewed DHS documents including all pertinent legal and policy documents produced by defendants. Center staff interviewed DHS employees, including case workers and supervisors within the CFSD, administrators in the Family Services Administration, and the Director of Income Maintenance at the DHS. Additionally, Center staff observed several depositions, including those of all four branch chiefs within the CFSD. The Center Report concludes that the District has consistently failed to meet the requirements of federal and District law and its own policy. These failures, according to the report, have resulted in a system that does not adequately protect at-risk children and families. *See* Center Report at i. For each area of the District's alleged failures, the report offers several specific recommendations for improvement, both short-term and long-term. In addition, the report sets forth a proposed "Sequenced Implementation Plan," including target dates, for putting the Center's recommendations into action. *See* Center Report at 75–80.

### 4. *Psychiatrists' Testimony*

Testifying at trial were four child psychiatrists who had reviewed the case records of and conducted personal interviews with four of the named plaintiffs. Each gave their expert opinion on the psychological and emotional harm that the named plaintiffs have suffered as a result of the failures of the defendants to provide for their needs. In addition, Dr. Harold Eist gave his opinion about the psychological and emotional harm to all of the children in the plaintiff class, resulting from the system-wide deficiencies in the delivery of services to foster children and children who have been the subjects of reported abuse or neglect.

### B. Findings of Fact

Based on all of the evidence presented, including the stipulations entered into by defendants, the Court issues the following findings of fact. To assist the reader in understanding the significance of these facts, the Court will first present some general findings and will then present the bulk of the remaining findings in categories that relate to the statutory framework detailed in Part I, *supra*. The Court will conclude with those findings involving harm to the plaintiff class.

### 1. *General Findings*

As the Court has previously explained, the DHS is the District's umbrella social services agency. To illustrate the hier-

---

**12.** Charlotte Haberaecker, although not a staff member of the Center, also contributed to the Center report and testified at trial. Ms. Haberaecker is a senior manager of Management Consulting Services in the Office of Government Services at the accounting firm of Price Waterhouse. She testified as an expert in the types and uses of automated information in public services programs.

archy of the agency as it relates to this case:

```
Department of Human Services (DHS)
              ↓
Commission on Social Services (CSS)
              ↓
Family Services Administration (FSA)
              ↓
Child and Family Services Division (CFSD)
```

The CFSD, which has primary responsibility for the implementation and administration of the child welfare system, is comprised of five branches:

The Intake and Crisis Services Branch (ICSB) is responsible for receiving and investigating reports of neglect filed with the CFSD. The branch maintains a 24–hour hotline specifically for this purpose. The branch also makes initial assessments of need and provides emergency and crisis intervention services. Two Intensive Services Branches (ISBs) are responsible for those cases for which an initial investigation indicates that the placement of a child is probable or that family breakdown is imminent or very likely without the provision of intensive services to the family. The branches were planned so that each social worker would handle a maximum of 20 cases and would work intensively with the assigned families in a short period of time. The Continuing Services Branch (CSB) is responsible for those cases for which the initial investigation indicates problems resulting from chronic conditions that require the continuing provision of services but are not likely to lead to total family breakdown. The branch also provides continuing services to children in foster care and their families. The Adoption and Placement Resources Branch (APRB) is responsible for recruiting foster and adoptive families, conducting home studies, and training foster and adoptive parents.

Finally, the Monitoring Unit, which is not a "branch" but a separate unit reporting directly to the division chief, is responsible for monitoring all foster homes and group homes in which children in the custody of the CFSD are placed and which are located within a 50–mile radius of the District of Columbia. The unit monitors these facilities to ensure compliance with all federal and local statutes and regulations. *See* CFSD Policy Manual at Chapter 100.

According to stipulations entered into by the parties, as of September 30, 1988, 2,166 children were in foster care in the District of Columbia. As of June 1989, the average stay for children in the District's foster care system was 4.8 years. This compares to a national average of just over two years. *See* Center Report at ii. According to the Stein Report, as of December 1989, 27 percent of the children in the District's custody had been in that status for more than five years and 60 percent had been in custody for more than two years. Approximately 95 percent of the children in the District's foster care are black.

2. *Abuse and Neglect Investigations and Preventive Services*

a. Timeliness of Investigations

Both federal and District law require prompt investigations into reports of abuse or neglect. 42 U.S.C. § 5106a(b)(2); D.C. Code Ann. § 6–2102(b). District law and CFSD policy specify 24 hours for initiating

investigations and two weeks for completing investigations. D.C.Code Ann. § 6–2102(b) and CFSD Manual of Operations at § 301.15. Despite these stringent requirements, the stipulations entered into by the parties indicate that for several months during 1988, 1989, and 1990, the department consistently failed to initiate timely investigations into reports of neglect [13] and consistently failed to complete investigations within two weeks. In August 1988, for example, the ICSB failed to initiate investigations into five reports of neglect it received that month, involving seven children. As the backlog began to worsen, the then-acting-chief of the CFSD, Evelyn Andrews, notified the administrator of the FSA in her November 1988 monthly report that:

> Staff shortages in the critical area of protecting children has [sic] required supervisors to take uncovered caseloads, staff to cover for co-workers who are in the field or on leave (there has been a significant increase in staff absenteeism), staff to attempt to fulfill the demands made through court orders, and make every effort to comply with mandated timeframes. It is virtually impossible to protect children in such an environment and under the current conditions. *Children are at risk.*

Stipulation 137. One month later, in December 1988, the branch failed to initiate investigations into 30 reports it received that month, involving 84 children. At that time, the branch also had a backlog of 584 reports, involving 828 children, for which investigations had not been completed.

Despite the dire situation within the CFSD in December 1988, the backlogs continued to worsen throughout 1989 and 1990. In June 1989, the ICSB failed to initiate investigations into 50 reports it received that month, involving 75 children. It also ended the month with a backlog of 716 reports, involving 1,285 children, for which it had not completed investigations. A study conducted in fiscal year 1989 by

the chief of the ICSB revealed that the average length of time between the receipt of a report of neglect and the branch's initiation of an investigation was ten days.

Although the ICSB chief's report revealed serious and continuing failures to comply with District and federal law, the backlogs continued to grow. In January 1990, the ICSB failed to initiate investigations into 91 reports received during the month, involving 171 children. Additionally, it had a backlog of 1,112 reports, involving 1,853 children, for which investigations had not been completed. At the end of January 1990, the ICSB had only 12 social workers assigned to it to conduct investigations. Defendants have stipulated that as of February 1, 1990, staffing shortages within the CFSD prevented workers from initiating investigations within the statutory time period.

The number of backlogged investigations dipped slightly in early 1990, so that by April 1990, a new study conducted by the chief of the ICSB revealed that the average length of time between the receipt of a report and the initiation of an investigation had dropped to four days. Nevertheless, for nearly 50 percent of the reports received during April 1990, the ICSB failed to initiate an investigation within 24 hours. Moreover, the branch ended each month between July 1989 and May 1990 with an average backlog of approximately 1,200 reports for which it had not completed investigations. The backlogs were reported by the then-chief of the ICSB, Carolyn Smith, to the chief of the CFSD, Evelyn Andrews, in June 1990. Ms. Smith also reported that the branch lacked a sufficient number of automobiles to investigate neglect reports within 24 hours. Ms. Andrews reported the situation to the then-administrator of the FSA, Jean Hunter,[14] in her June monthly report.

During the summer of 1990, the ICSB borrowed workers from other branches and

---

**13.** The CFSD is responsible for investigating only reports of neglect. The District's police department is responsible for investigating reports of abuse. D.C.Code Ann. § 6–2104.

**14.** Ms. Hunter was originally named as a defendant in this action. She retired prior to the trial and defendant Elizabeth Parker is currently the acting director for the FSA.

tried to alleviate the backlog by working significant overtime hours. Nevertheless, by the end of August 1990, the ICSB had failed to initiate investigations into 41 reports it received that month, involving 93 children. It had also failed to complete investigations for 445 reports, involving 750 children. As of October 1990, it was taking the ICSB up to five days to initiate investigations into reports of neglect. According to the testimony of Carolyn Smith, as of December 1990, for the three units within the ICSB on the day shift, there were four vacancies out of a possible full staffing level of 15 social workers. On the evening shift, there were four vacancies out of five social worker positions. The midnight shift, primarily responsible for receiving reports and staffed in part with paraprofessionals, was fully staffed.

Based on the foregoing facts, almost all of which have been stipulated, this Court finds that the CFSD has, since at least the beginning of 1988, continuously failed to initiate investigations into reports of neglect or abuse within 24 hours and complete investigations within two weeks. These failures have been largely due to staff shortages and the lack of access to resources, such as automobiles, necessary to conduct investigations. The Court also finds, based on the testimony of Dr. Williams, an expert in the field of child welfare policy, as well as Ms. Smith, the former chief of the ICSB, that the failure to initiate timely investigations can be partially attributed to the inability to screen out inappropriate reports. Although many jurisdictions use screening instruments to lessen the number of reports requiring investigations, District law currently requires the investigation of all reports of neglect or abuse.

b. Provision of Preventive Services

Both federal and District law require the provision of services to enable a child for whom a report has been made to remain in the home or, if removal is necessary, to enable the child to return home as quickly as possible. *See* 42 U.S.C. § 5106a(b)(2) & (b)(3); D.C.Code Ann. § 6–2105 & § 6–2124. The CFSD is authorized to provide services including emergency financial aid, shelter, emergency caretaker services, homemaker services, day care, counseling, medical services, and other appropriate services. D.C. Code Ann. § 6–2124. Based on the testimony of Dr. Stein and Professor Walker, the Court finds that the CFSD has consistently failed to provide the services required to enable children to remain with their families or reunite with them if temporary placement is required.

According to Professor Walker's testimony and report, none of the case records of the named plaintiffs indicates that any services were provided to prevent placement. Similarly, according to the case reading conducted by Dr. Stein, none of the case records studied contained a judicial determination that "reasonable efforts" had been made to prevent placement, in accordance with federal law. Although defense counsel elicited through cross examination that the absence of a record of services in the children's case records does not necessarily mean that no services were provided, the Court finds little or no reason to believe that services were indeed provided. Testimony of social workers and of the former chief of the ICSB revealed that services frequently are not provided because they are not available. Defendants have admitted that although a number of parents have substance abuse and mental health problems, the CFSD has no drug treatment services or counseling services that it can provide directly to families in need. Similarly, although a substantial number of parents have housing and unemployment problems, the CFSD does not have the capability to directly provide housing or job services. Because the CFSD is unable to provide many direct services and does not have any priority access agreements with other agencies or organizations, defendants have candidly admitted that the CFSD has insufficient service resources to meet the "reasonable efforts" requirement of federal law. Based on the foregoing, the Court finds that defendants have consistently failed to provide services or otherwise use "reasonable efforts" to prevent placement. The result has been an increased risk of

arbitrary or inappropriate placements as well as an increased cost to the District.

### 3. *Continuing Services*
#### a. Placement

Once a child has come into foster care, either through voluntary placement or emergency placement resulting from a substantiated abuse or neglect investigation, both federal and District law place limits on the time a child may remain in care without a judicial determination that placement is in the child's best interests. Federal law mandates that a child return home within 180 days unless such a determination has been made, 42 U.S.C. § 672(e); District law mandates return home within 90 days unless the CFSD has requested the filing of a neglect petition in Superior Court. D.C.Code Ann. § 6–2123(a)(2).

By defendants' own admissions, since at least 1987, children have consistently remained in voluntary care for more than 90 days without the filing of a neglect petition. Between October 1, 1987 and September 30, 1988, nearly 75 percent of the children in voluntary placement had been in that status for longer than 90 days.[15] As of April 1988, there were children in voluntary care who had been in that status for as long as two years without any neglect petition having been filed. One of the named plaintiffs, LaShawn A., was in voluntary care for two-and-a-half years. Several of the other named plaintiffs were also in voluntary care well beyond the 90–day time limit imposed by District law. As of April 1988, defendants have admitted that there was no accurate listing of the number of children in voluntary care and that the DHS lacked a system for tracking voluntary care cases and for monitoring services to the families of children in voluntary care. These facts were presented to the administrator of the FSA in a memo submitted by Evelyn Andrews in July 1988.

Ms. Andrews continued to submit similar memos to the administrator of the FSA throughout 1989 and 1990 as the problem continued to persist.

Based on defendants' admissions and the uncontroverted testimony of the experts in the case, the Court finds that the CFSD has consistently failed to comply with the statutory time limits regarding voluntary and emergency care. The result has been a state of limbo for these children who, while in "emergency care," do not have any case plans prepared on their behalf. The misuse of voluntary and emergency care in the District is one of the reasons why foster care drift has occurred for so many children in the District foster care system.

The evidence presented in this case has revealed that not only are children remaining in voluntary or emergency care beyond the statutory time limits, they are also spending much of their foster care experience in inappropriate placements. Federal law and CFSD policy require the placement of children in the least restrictive setting and in close proximity to their families. *See* 42 U.S.C. § 675(5)(A); CFSD Manual of Operations at § 602.5(a). According to Professor Walker's testimony and report, all of the named plaintiffs were placed inappropriately: LaShawn A., who came into the CFSD's care when she was two years old and was a "special needs" child,[16] was placed in the home of an elderly foster mother who had no intention of adopting her. Demerick B. came into care at 11 months of age and was placed in a congregate facility for three years rather than in a family foster home where he could have developed a continuous and affectionate relationship with a single adult. Gary C. and Leo C. came into emergency care when their mother was hospitalized for psychiatric treatment. They were placed in a congregate facility where they remained

---

**15.** Between September 1987 and March 1988, the CFSD established a special unit known as the Emergency Care Unit within the Intensive Services Branch. During the six months the unit operated, it successfully reunited, within the mandatory 90–day time period, 27 of 68 children referred to it. As a result of budgetary constraints, however, the CFSD disbanded the Emergency Care Unit in March 1988.

**16.** According to the testimony of CFSD employees, a "special needs" child is one who is over five years of age, is part of a sibling group, or has physical or emotional problems.

for nearly two years without a consistent, nurturing care giver. Robert D. came into care when he was a year-and-a-half old and was abandoned by his mother. He has been in six different family foster homes and one group home, experiencing no continuity of care and severe foster care drift. Tyrone E. was seven years old when he was removed from his home due to reports of abuse. Although he is a special needs child with severe emotional problems, he was inappropriately placed in multiple foster homes in which the foster parents had received no special training. He was also placed in over-restrictive out-of-state facilities that were hundreds of miles from his family. Kevin E. was placed in foster care when he was 20 days old and has spent all but 43 days of his life in foster care. He is a special needs child who has suffered additional trauma from the prolonged placement in congregate care as an infant and the experiences of at least three abrupt separations from foster families who had indicated plans to adopt him. He was inappropriately returned to his mother, who was an unfit parent, on several occasions. These inappropriate placements, along with others, have been partially the result of social worker vacancies that preclude sufficient training sessions and home studies to ensure appropriate placements.

Defendants have admitted that the demand for foster homes has outpaced the supply and that since at least January 1989, the CFSD has frequently been unable to place all of the children for whom it has received requests for placement. Since at least 1988, there has been an increase in the number of children entering foster care with special needs. Although these children cannot adequately be cared for in traditional foster homes, the DHS does not directly operate any therapeutic foster homes.[17] The only such homes available to the CFSD are those operated by the Consortium on Child Welfare. As of November 1990, the department was making no efforts to develop therapeutic foster homes.

Similarly, although the CFSD needs foster homes designed to provide short-term or emergency care for children, it has no foster homes designated for this purpose. It also has an insufficient number of foster homes in which to place babies who have tested HIV-positive. Perhaps as egregious a fact as any is the defendants' own admission that the CFSD placement office has no automated information system to enable it to identify vacancies in foster homes, group homes, and institutions. The placement coordinator must telephone individual foster homes to determine if space is available. When the placement coordinator is unable to identify a placement vacancy, the task falls on the child's social worker and supervisor. The testimony of a frontline social worker within the CFSD, Chainie Scott, revealed that children often end up spending entire days in social workers' offices while the workers attempt to locate placements. In light of all of the foregoing facts, most of which have been stipulated, the Court finds that defendants have consistently failed to place children in the least restrictive placements consistent with their needs.

b. Case Planning

Federal and District law, as well as the CFSD's own policy, require the timely preparation of case plans for all children in foster care. *See* 42 U.S.C. § 675(1); 45 C.F.R. § 1356.21(d); D.C.Code Ann. § 6–2107(b); CFSD Manual of Operations at § 401.2. According to the uncontroverted testimony provided by plaintiffs' experts at trial, reasonable professional standards require case plans to articulate specific goals with realistic strategies and timelines for accomplishing them. Case plans are necessary to ensure that children receive proper care, are placed in appropriate settings, and remain in foster care no longer than necessary. To assure these things, a good permanent placement system for children should ensure that children who cannot remain with or be returned to their biological parents be freed for adoption and placed in adoptive homes. When adoption

---

**17.** Therapeutic foster homes are those in which the foster parents have been specially trained

and receive special services to help them handle special needs children.

is the goal, the responsible agency should aggressively recruit potential adoptive families and should implement all relevant procedures to allow children to become legally available for adoption in a timely manner. Long-term foster care should be used only rarely, and only when appropriate.

CFSD policy provides for five possible case plan goals: return home, placement with a relative or other person, adoption, independence, or continued foster care. Independence is only appropriate as a goal if the child is over the age of 16 and all other permanent options have been ruled out. Continued foster care is not to be the goal unless the child is at least 13 years old and all other permanency options have been ruled out because of the child's rejection of adoption due to an attachment to the foster parents or to the natural parents. CFSD Manual of Operations at § 401.4. Goals are to be set for one-year timelines and should not exceed 18 months, except for the goals of independence and long-term foster care.

Despite these policy guidelines, the evidence presented in this case establishes that children are often given totally inappropriate goals. According to the Stein Report, approximately 8 percent of the children in the District's foster care have a planning goal of independent living. Of those with such a plan as of December 1989, 35 percent had been assigned that goal before they were four years old and 49 percent had been assigned that goal before they were 16 years old. Approximately 10 percent of the children in the District's foster care have a planning goal of continued foster care. Of those with such a plan as of December 1989, 29 percent had been assigned that goal before they were one year old, 48 percent had been assigned that goal before they were four years old, and 54 percent had been assigned that goal before they were 10 years old. In 47 percent of these cases, there was no evidence of efforts to return the child to his or her family, and in 56 percent of these cases, there was no evidence that the CFSD had considered adoption.

Dr. Stein's report revealed the following, among other things, with respect to the existence of case plans: Of the children in the District's custody with a planning goal of return home as of December 1989, 62 percent did not have a written case plan. Of the 38 percent who did have written case plans, none contained all of the information required by federal law. *See* 42 U.S.C. § 675(1) and the discussion at Part I(B)(2), *supra.* These plans routinely failed to include information on goals, strategies for achieving those goals, and timeframes. Also absent from the files of many of the children with goals of return home were visiting schedules mandated by the CFSD policy. *See* CFSD Manual of Operations at § 401.2(h). Seventy percent of these children had no parent-child visiting schedules in their records, 91 percent had no worker-child visiting schedules, and 94 percent had no worker-parent visiting schedules.

Professor Walker's report was also quite revealing: in none of the named plaintiffs' case records did she find a written case plan that contained all of the information required by federal and District law and reasonable professional standards.

The defendants' admissions strongly support the observations of both Dr. Stein and Professor Walker. The defendants have admitted that as of July 1990, the caseloads in the Intensive Services Branches and the Continuing Services Branch were so high that workers were unable to closely monitor families or develop case plans in a timely manner. With respect to implementing the goals set for children in foster care, the evidence speaks for itself: for those with goals of return home as of December 1989, 52 percent had had that goal for 18 months or more, 41 percent for two or more years, and 23 percent for three or more years. Even more revealing is the fact that the average stay for children in the District's foster care system is just under five years—a third of their childhoods.

Based on the foregoing, the Court finds that the CFSD frequently assigns inappropriate goals to the children in its foster care and consistently fails to prepare written case plans to enable the children to

realize their goals. Although defense counsel repeatedly elicited trial testimony that the need to respond to frequent "crises" often precludes the preparation of case plans, the Court finds, based on the uncontroverted expert testimony, that the results of not having a case plan may be just as devastating as the results of most crises. Without a case plan that sets forth a goal and a means of achieving it, children are relegated to spending significant chunks of their childhoods, if not their entire childhoods, in foster care, constantly bouncing from crisis to crisis.

### c. Services

Just as the CFSD has often failed to provide any services to prevent the removal of children from their homes, the Court finds based on the evidence before it that the CFSD has consistently failed to provide services once children are removed from their homes and placed in foster care. The Stein Report indicates that, based on case records, of the children in foster care as of December 1989 whose goal was return home and who had entered into care through voluntary placement, the CFSD had failed to provide services in 77 percent of their cases. The failure to provide services designed to facilitate a child's return home is frequently due to the unavailability of those services.

The evidence reveals that the CFSD is failing to provide other necessary services as well—those that would constitute "proper care" under federal law. *See* 42 U.S.C. § 675(1). Although CFSD policy mandates that all children entering care undergo a complete medical evaluation prior to placement, *see* CFSD Manual of Operations at § 602.8(a), reports submitted by Evelyn Andrews to the administrator of the FSA between May 1988 and May 1990 indicate that the CFSD did not have adequate medical screening facilities for children coming into care. Once in care, Dr. Stein's report indicates that as of December 1989, 44 percent had not had a medical examination since their entry into care. Seventy-nine percent had not had a dental examination.

Although CFSD policy requires that a social worker have "face-to-face contact" with each child in foster care at least once a month, *see* CFSD Manual of Operations at § 603.2(a)(1), Dr. Stein's report reveals that in the cases of 64 percent of the children in the District's foster-care custody with a planning goal of return home as of December 1989, there was no evidence that the children had ever been visited by their social workers. Of the children with a planning goal of adoption as of December 1989, there was no evidence of visits in 52 percent of the cases. According to defendants' own admission, as of October 1990, 149 children in the District's foster care had no social worker assigned to them.

Based on the foregoing, the Court finds that the CFSD has consistently failed to provide appropriate services and proper care to children in its custody.

### d. Periodic Reviews

Both federal and District law require periodic judicial or administrative reviews for the purpose of determining the continued need for and appropriateness of placement. *See* 42 U.S.C. § 675(5)(B); D.C.Code Ann. § 16–2323(a). According to the Stein Report, of the children in foster care as of December 1989 who were eligible for a six-month review, only 13 percent had received a timely review. Defendants have admitted that as of August 1, 1990, children were not receiving timely administrative reviews. Based on the foregoing, the Court finds that the CFSD has consistently failed to comply with federal and District requirements regarding judicial and administrative reviews.

### e. Adoption

District law requires that the CFSD "prepare a permanent plan" for a child when he or she cannot be returned to the home within a reasonable length of time. D.C. Code Ann. § 6–2123. According to the unrebutted testimony of plaintiffs' experts in this case, such permanency planning is also required under all reasonable professional standards for child welfare. To achieve permanency for children who cannot return home, it is crucial that parental rights be terminated and that children be legally "freed" for adoption. Defendants have admitted that children who are not legally

freed for adoption are less likely to be considered for adoption by prospective adoptive parents than those who have been freed. Nevertheless, of the children in the District's foster care with a planning goal of adoption as of December 1989, 66 percent had not been legally freed for adoption. As of July 30, 1990, the majority of children that the CFSD's adoption coordinator was trying to place were not legally freed. This results in "at-risk adoptions" in which a potential adoptive parent takes a child into custody with the risk that parental rights will not be terminated and the parent will never be able to legally adopt the child.

According to the Stein Report, for those children who, as of December 1989, had a planning goal of adoption but were not yet legally freed for adoption, in only 26 percent of the cases had information concerning terminating parental rights been submitted to an attorney. For half of these children, the CFSD staff had failed to discuss the possibility of relinquishment of parental rights with their mothers. Testimony on behalf of the defendants revealed that the blame for failing to terminate parental rights lies jointly with the District's Office of Corporation Counsel. Even when the CFSD provides the necessary information to an attorney in the Corporation Counsel's office, according to the testimony of Evelyn Andrews, the attorney often refuses to seek termination of parental rights until an adoptive family is found. This presents a Catch–22 because the Adoption and Placement Resources Branch (APRB) often is unable to recruit adoptive parents until parental rights have been terminated. Additionally, defendants have admitted that although in the spring of 1990 an attorney was hired specifically to file and prosecute termination petitions, by August 1990, the Office of Corporation Counsel had not formally authorized the attorney to file such petitions. Based on the foregoing, the Court finds that the CFSD has consistently failed to expedite the progression of the children in its custody toward permanent placement through adoption.

Part of the CFSD's failures can no doubt be attributed to its noncompliance with its own policy that children with a goal of adoption be referred to the APRB within three days of setting that goal. *See* CFSD Manual of Operations at § 703.3. Nor has the CFSD complied with District law requiring certain recruitment efforts such as listing children on appropriate adoption exchanges. Defendants have stipulated that in the case of the named plaintiff Demerick B., for whom it was recognized early on that return home would be impossible, no referral to the APRB was made for a year-and-a-half after his last parental visit and two months after he was adjudicated as a neglected child. After the referral, which occurred in January 1988, Demerick's picture was never even displayed to a potential adoptive parent for another year. He was referred to only one adoption exchange. There was no case plan in Demerick's record until June 1989. In August 1989, when Demerick entered into an at-risk adoption placement, no motion had been filed to terminate parental rights. As of May 23, 1990, Demerick continued to be in foster care and was not yet legally adopted.

Dr. Stein's report reveals that the delays in Demerick's case also occur in the cases of numerous other children. For those in foster care as of December 1989 with a goal of adoption, the cases of only 29 percent had been referred to the APRB within the required three days. In 14 percent of the cases, notification was sent to the APRB more than a year after adoption was chosen as a goal. Moreover, of the children who were freed for adoption as of December 1989 but who had not been placed in pre-adoptive homes, 24 percent had never been referred to the APRB for placement. Defendants have stipulated that the high caseloads of the social workers within the CFSD prevent them from making adoption referrals in a timely manner.

The evidence presented on both sides of this case reveals that once a child has been referred to the APRB for placement, the wait for an adoptive home may be lengthy indeed. Defendants have stipulated that as of August 1990, only one-and-a-half em-

ployees were responsible for recruiting all adoptive and foster parents. Since that time, according to the testimony of Geneva Ware, who was appointed supervisor of a newly created Recruitment Unit in August 1990, there have been three employees actively recruiting potential adoptive and foster parents. Nevertheless, as Ms. Ware admitted at trial, the unit's efforts to recruit have not kept up with the demand. The Court is somewhat encouraged by defendants' belated recognition of the need to enhance recruiting efforts, but notes that even as Ms. Ware was testifying about the inability to keep up with demand, another witness in this case testified that she had been waiting for over a year to adopt a foster child.

### f. System Infrastructure

Federal and District law contain requirements pertaining to case tracking, caseloads, supervision, and training. The facts related to these "infrastructure" elements will be discussed in turn.

#### i. *Case Tracking*

Federal law requires any child welfare agency receiving federal funds to maintain an information system from which the status, location, and goals for the placement of all foster care children may be readily determined. 42 U.S.C. § 627(a)(2)(A). Such a system is also mandated by reasonable professional standards and, this Court believes, by basic common sense. Defendants have admitted that although its current information system, the WARD Tracking System (WTS), was designed to collect and process information regarding case management, client tracking, and vendor payments, the system is not adequate. According to the unrebutted testimony of Charlotte Haberaecker, an expert in the types and uses of automated information systems for human services agencies, the WTS cannot provide accurate information on the number of children in emergency care, how long they have been in that status, and when they are reaching the 90–day deadline for remaining in that status. The WTS also is unable to accurately identify the physical location of all of the children in foster care. Additionally, it does not contain accurate information concerning vacancies in foster homes, nor does it contain accurate information regarding which social workers are assigned to which children.

Ms. Haberaecker's testimony is supported by numerous of defendants' admissions. Defendants have admitted that the CFSD lacks sufficient staff to operate and maintain the WTS. An April 1988 memorandum to the former administrator of the FSA warned that children were not being entered into the system in a timely manner, if at all. Defendants acknowledge that because much of the information in the system is missing or out-of-date, the system cannot generate accurate and meaningful reports about placement vacancies, overplacements, administrative reviews, court activity, family visits, or caseworker assignments. Although the system requires substantial upgrading, no budget money has been made available for the work. Instead, CFSD social workers track information on thousands of three-by-five-inch index cards. Over the last several years, the deficiencies in the system were repeatedly made known to high-level officials within the administration of the former mayor of the District of Columbia, Marion Barry, as well as to the mayor himself. In June 1989, the former administrator of the FSA met with then-mayor Barry to inform him that the system's deficiencies precluded the CFSD from performing its assigned tasks.

The Court's concluding findings in this area are plucked from nearly 100 of defendants' stipulations regarding information tracking. In the words that defendants stipulated to:

As of August 1, 1990, the District of Columbia had no information system that identified all children in the District's foster-care custody.

Stipulation 1549.

The CFSD placement office has no automated information system so as to enable it to track the location of children placed in foster homes, group homes, or any other type of placement.

Stipulation 1563.

In a memorandum dated March 27, 1990, the DHS employee responsible for the

operation of the Ward Tracking System (WTS) notified the office of defendant Barbara Burke–Tatum [the commissioner of the Commission on Social Services] that it was necessary to confer upon the WTS office official status within DHS so DHS could qualify for federal reimbursement for WTS operations.

Stipulation 1567.

In a March 30, 1990, memorandum, defendant Barbara Burke–Tatum was notified that, because the DHS office that operates the Ward Tracking System had no official status within DHS, the Department was unable to apply for federal funds that would otherwise cover 90% of the office's costs. According to the memorandum, "In a time of tight budgeting for direct services it is unconscionable not to maximize resources. It would be a relatively simple matter to place this office either in OIS or FSA where reimbursements would be forthcoming and adequate· staffing could be provided."

Stipulation 1568.

Because the DHS office that operates the Ward Tracking System had no official status within DHS, the Department was unable to apply for federal funds that would otherwise cover 90% of the office's costs.

Stipulation 1569. Based on the foregoing, the Court finds that the WTS is clearly inadequate for keeping track of the children in the District's foster care. The Court can only wonder how an agency that cannot track the location of the children in its custody can possibly comply with the remaining requirements· of federal and District law, much less with reasonable professional standards.

### ii. Caseloads

The Court need not look beyond defendants' own admissions to issue its findings in the area of social worker caseloads.[18] Defendants have admitted that the ICSB must be fully staffed in order to initiate investigations within 24 hours of receipt, that the ISB social workers should have maximum caseloads of 20 families so that they are able to provide needed casework services, and that CSB workers should have caseloads not to exceed 35 to 40 families per worker. These maximum caseloads have been greatly surpassed for at least the last several years, leading to the CFSD's inability to initiate timely investigations, provide needed services, ensure appropriate placements, prepare case plans, visit with foster children and parents, recruit foster and adoptive families, monitor foster homes and institutions, and claim all federal funding to which the CFSD should be entitled. The excessive caseloads have been due in large part to the department's admitted failure to fill social worker vacancies. This failure has been in part the result of the department's former policy of hiring "term" employees rather than permanent employees and of the low salaries in comparison to neighboring jurisdictions.

Defendants' admissions indicate numerous occasions over the past several years in which officials within the Barry Administration were made aware of the severe staff shortages within the CFSD. Scores of intradepartmental memos warn that the staff shortages may result in failure to comply with the District's Prevention of Child Abuse and Neglect Act and that staff must be hired to avoid serious injury or death to children in custody. As early as July 1988, the former mayor was notified by the chair of his Committee on Child Abuse and Neglect that the "severe staffing problem" in the CFSD was "creating a situation that is detrimental to the safety and well-being of children and the preservation of families. It has affected all levels of every program and service area, which adversely impacts upon the Division's ability to comply with Federal and District laws and regulations and to provide comprehensive services to families and children." Stipulation 1161. In August 1988, then-mayor Barry told CFSD workers that 32 new social workers would be hired by October 1, 1988. This promise was the upshot of several meetings and memorandums from front-line social workers to high-level department officials. These so-

---

**18.** Defendants stipulated to over 200 facts in this area.

cial workers had complained that they were unable to adequately protect the safety of the children assigned to them because of the high caseloads and lack of resources such as automobiles. By October 1, 1988, only one new worker had been hired, seven had left, and the CFSD had not acquired new automobiles. As of October 10, 1988, only 10 new workers had been hired.

In June 1989, then-mayor Barry was again informed about the severe staff shortages. He was told that 41.3 percent of CFSD staff positions were vacant and that the "tremendous amount of stress that leads to worker burnout" contributes to the "rapid turnover" of social workers. Stipulation 1183. The former mayor was informed again in November 1989 and January 1990 that the CFSD was experiencing serious staff shortages. Nevertheless, on June 28, 1990, the District of Columbia instituted a hiring freeze that barred filling CFSD vacancies.

Recently, the DHS has undertaken new efforts to fill its' empty social worker positions. As of November 1990, according to the testimony of the acting administrator of the FSA, Elizabeth Parker, the department began hiring on a permanent basis. It is also converting its term employees to permanent positions. Additionally, according to Ms. Parker's testimony, the paperwork to increase social workers' salaries to a competitive level was, at the time of trial, on the city administrator's desk. The department has also run ongoing vacancy announcements and participated in job fairs and campus recruitments in an effort to recruit new workers.

Despite the evident attempts to attract workers, there is no indication yet that the past failures have been remedied. Instead, the fact remains that, at the time of trial in February 1991, 107 of a total of 239 social worker positions in the CFSD remained vacant. Chainie Scott, a social worker in the CSB, testified that as of January 1991, she was responsible for 69 families and 251 children. Although this was down from a high of 131 families and over 300 children, it was still well above the maximum caseloads that defendants have admitted must

not be exceeded for social workers to do their jobs. Ms. Scott testified that even with her caseload down to 69 families, it is impossible for her to visit each child regularly. Instead, she sees the children only when a crisis arises or when a court hearing is approaching. The Court finds that, based on defendants' admissions, Ms. Scott's testimony, and the unrebutted testimony of plaintiffs' experts, the CFSD is unable to carry out its responsibilities under federal and District law while its social workers are operating at existing caseloads.

### iii. *Supervision*

The uncontroverted expert testimony presented to the Court is that reasonable professional standards require supervisors to play a role in educating, supporting, and directing staff; in ensuring quality control; and in ensuring that the child welfare agency's policies are carried out. By defendants' own admissions, the extreme staff shortages have resulted in CFSD supervisors carrying caseloads normally assigned to social workers. By carrying heavy caseloads, these supervisors have been unable to train staff and monitor cases to ensure the safety and well-being of the children for whom their staff is responsible.

### iv. *Training*

According to the uncontroverted testimony of plaintiffs' experts, reasonable professional standards require specialized training for handling cases of child maltreatment and providing services. Ongoing training should be provided to case workers, managers, supervisors, social service representatives, foster parents, respite providers, parent aids, and homemakers. Although defendants agree that new social workers should receive formal training and existing social workers should receive ongoing training, until June 1990, no such training was available. In June 1990, the DHS hired James Oliver to set up a training program in the CFSD. At the time of trial, the CFSD had conducted two training sessions, involving approximately 70 social workers, in the areas of general information about the DHS, specific case planning

and case management skills, and the requirements of federal and District law. The training sessions consisted of between 30 and 40 hours each but included no field training. Mr. Oliver testified that more training sessions are planned for the future and will be directed toward existing social workers, management, and clerical staff, as well as to new social workers. Mr. Oliver testified that he hopes to have completed a session of training for everyone in the CFSD by the end of 1991, at which time he will take over the position of chief of one of the Intensive Services Branches. Mr. Oliver stated that he anticipates ongoing training after 1991.

The testimony of Mr. Oliver indicates that defendants have at last taken positive steps toward implementing a training program that may eventually comply with reasonable professional standards. The Court remains concerned, however, that Mr. Oliver's plan for continued training sessions is not embodied in any kind of written document submitted to the Court, as remains true of other promised reforms the Court heard about from the District. With the fragile budget situation that faces the CFSD, the DHS, and the District as a whole, there is no guarantee that training will not be cut due to lack of funding. The Court is also concerned that there is still no orientation training provided to new social workers before they begin working on cases. Chainie Scott and Thomas Wells, both social workers in the Continuing Services Branch, testified at trial that such training would have been very valuable to them. In sum, although the Court finds that the training program just initiated by defendants is a good start, it does not yet rise to the level that professional standards deem adequate.

### 4. *Monitoring Foster Homes and Institutions*

District law requires facilities providing foster care within the District to be li-

censed and inspected annually. Facilities caring for children outside of the District must also be inspected annually. D.C.Code Ann. § 3–802 & § 3–805. Similarly, the CFSD Manual of Operations requires regular evaluations of all foster homes and facilities to ensure their quality and compliance with applicable laws and regulations. CFSD Manual of Operations at § 902.2.[19] The Monitoring Unit, within the CFSD, is responsible for this task. Unfortunately, as defendants have readily admitted, the same problems with staff shortages and high caseloads have negatively affected the Monitoring Unit's ability to carry out its responsibilities.

In preparing his report for use in this case, Dr. Stein requested the records of 123 foster homes in which 210 children were located. The Monitoring Unit provided him with the records of 108 foster homes.[20] All of these homes had been approved for the placement of children, but there was evidence of biannual reviews in only 57 percent of them.

The defendants' own admissions corroborate Dr. Stein's report. According to stipulations entered into by the parties, between December 1988 and July 1990, the Monitoring Unit failed to monitor any of the foster homes operated by the Consortium for Child Welfare in which District children were placed. In July 1990, the supervisor of the unit admitted that the unit had insufficient staff to monitor foster homes and group homes as required by the CFSD policy. The supervisor believed the unit needed two additional social workers to carry out its responsibilities. Based on the Stein Report and defendants' own admissions, the Court finds that the CFSD has consistently failed to monitor foster homes and institutions in accordance with the requirements of District law and CFSD policy.

### 5. *Missed Financing Opportunities*

Plaintiffs' experts and defendants themselves agree that early intervention and the

---

**19.** The CFSD manual requires biannual reviews rather than annual reviews as required by District law. No explanation has been provided for this discrepancy; however, Evelyn Andrews testified at trial that the Monitoring Unit is responsible for yearly visits to traditional foster homes and group homes.

**20.** The other 15 could not be located.

provision of preventive services is more cost-effective than removing a child from the home. In a June 1988 Briefing Overview to then-mayor Marion Barry, the DHS reported that during fiscal year 1987, an average of $5,000 to $6,000 was spent per family per year for preventive services, while an average of $17,000 was spent on each child in specialized foster care and group homes and an average of $50,000 was spent on each child in residential treatment facilities. Virtually the same figures were presented to the mayor in the department's June 1989 Briefing Overview.

According to the uncontroverted testimony of Judith Meltzer, an expert in the financing, administration, and delivery of human services including child welfare services, the DHS currently allocates and spends funds in the least cost-effective way possible by spending large sums on out-of-home care and little on preventive services. According to Ms. Meltzer, by establishing a program to provide intensive in-home services to prevent the need for placement in foster care, the department could save from $1 to $2 million per year by the second year, assuming only a 40 percent success rate. Approximately 20 families could be provided intensive in-home family services for the cost of placing one child in a residential facility. In the case of named plaintiff Demerick B., Ms. Meltzer estimates that the DHS could have saved roughly $12,000 per year by placing Demerick in a foster home with supportive services rather than in the expensive residential treatment facility where he spent three years.[21] Had he been placed in an adoptive family, the department probably would have spent roughly $12,000 over the entire three-year period. In the case of named plaintiff Tyrone W., Ms. Meltzer estimates that placements in three foster homes, two hospitals, and two residential treatment facilities over a 28–month period cost the DHS approximately $100,000. Alternatively, had the DHS provided Tyrone and his family with intensive in-home services including mental health counseling, day care, and homemaker services, designed to prevent Tyrone's removal from the home, the estimated cost would have been $46,000. Defendants have offered no expert testimony to rebut Ms. Meltzer's estimates or her conclusions. Based on this, the Court finds that the DHS is not using its funds in a cost-effective manner, resulting in children being removed from their homes and placed in foster or institutional care without any reasonable efforts having been expended to permit them to remain at home.

In addition, Ms. Meltzer gave uncontroverted testimony that the District is currently losing millions of dollars in available federal funds because of its serious management and systemic deficiencies. Federal reimbursements under the Adoption Assistance Act are "open-ended." That is, there is no cap on the amount of money a state agency may receive for certain eligible activities or services provided to eligible children. States and the District of Columbia are reimbursed according to an established "Federal Financial Participation" rate, which is 50 percent for most eligible activities and 75 percent for eligible training activities. To receive federal reimbursements under the Act, the claimant must establish not only the eligibility of the activity, but the eligibility of the child benefiting from that activity. Eligibility for reimbursements under the Act is tied to eligibility for the Aid to Families with Dependent Children (AFDC) program. At least 75 percent of children in the District's foster care are AFDC eligible, yet the CFSD had established eligibility under the Adoption Assistance Act for only 24 percent in July 1987 and 22.6 percent in July 1988. This compares to eligibility rates of 72 percent in New York City, 64 percent in Pittsburgh, 56 percent in Philadelphia, and 50 percent in Montgomery County, Maryland, an affluent suburb of the District of Columbia.

---

21. Ms. Meltzer estimates $17,000 per year per child for placement in a foster home with supportive services and $29,000 per year for placement in St. Ann's Maternity and Infant Home, where Demerick was placed. The cost for placement in St. Ann's is based on the monthly cost as of the summer of 1990.

In fiscal years 1985 and 1986, the U.S. Department of Health and Human Services (HHS) disallowed 76 percent of the District's claim for $7.8 million in reimbursements under the Act. The HHS report attributed the high rate of disallowance to noncompliance with federal regulations and the department's own policies and procedures. Some of the claims were disallowed due to the CFSD's failure to obtain court-ordered custody of children who had been in the District's care for more than 180 days. Some were disallowed because children were in homes that did not have current licenses or did not qualify as foster homes. Still others were disallowed because there were no case records for children on whose behalf payments were to be made.

Ms. Meltzer estimated that due to the DHS's failure to properly establish eligibility under the Adoption Assistance Act for all children entering the system, its failure to properly document and claim all allowable training and administrative costs under the Act, and its failure to comply with all of the procedures that must accompany claims, the District is currently losing approximately $14 million a year in potential funding under the Adoption Assistance Act. In addition, it is losing another $7 million per year in Medicaid funding due to its failure to establish and maintain Medicaid eligibility for the children in its care, among other things. In total, Ms. Meltzer and the Center Report conservatively estimate that the District could obtain, at a minimum, an additional $21 million a year in federal reimbursements by ensuring that the proper procedures for making the claims are carried out.[22] Other states have seen even greater increases. According to Ms. Meltzer's testimony, the state of Ohio received $5.8 million in reimbursements in 1984, but after embarking on a concerted program to maximize its revenue assistance, received $52 million in reimbursements in 1990. Similarly, the state of Pennsylvania increased its reimbursements from $43 million in 1984 to $97 million in 1990.

The Court gives credit to the testimony of Elizabeth Parker, current acting administrator of the FSA, that after federal reviews in 1987, 1988, and 1989, the department was never notified that it was ineligible for federal funding. The Court nevertheless finds, based on Ms. Meltzer's testimony, that the amount of federal funding could have been greatly increased had the department complied more fully with federal laws and regulations and CFSD policy. The Court has listened to defense counsel argue that the District is operating at a severe deficit and that all departments within the city are under stringent budgetary constraints. In essence, defense counsel has argued that compliance with federal and local laws is impossible. The experiences of other states, such as Ohio and Pennsylvania, show that it is not impossible. Moreover, the evidence shows that over a five-year period, by expending a minimal effort, the District could obtain over $100 million in federal funding. The Court finds it disingenuous for the District to blame its inadequacies on a lack of funding when it has failed to obtain the generous funding that is readily available to it.

### 6. *The Proposed Realignment*

Throughout defendants' case in chief, the Court was presented with much testimony about a proposed "realignment" that the CFSD is undergoing to better carry out its responsibilities. Evelyn Andrews, chief of the CFSD, testified that the division intends to realign itself in a way that provides for social workers to specialize in certain areas and thereby reduce their caseloads. Ms. Andrews testified that various committees were working on a plan for realignment. Despite the Court's repeated requests for documentation of this alleged plan, the best that defendants were able to provide was a brief proposed organizational

---

**22.** Although defendants did not offer any expert to rebut Ms. Meltzer's estimates, the Center Report indicates that the Director of Income Maintenance within the department has previously estimated that the District could realize an additional $10 to 12 million in Adoption Assistance Act funds per year by making a number of administrative changes. This estimate is not far from Ms. Meltzer's $14 million estimate.

chart for the realigned division. This chart indicates that under the division chief would be three deputy chiefs: one for "Prevention and Protection," one for "Foster Care and Adoption," and one for "Operations." Under the deputy chief for Prevention and Protection would be the "Prevention, Intake and Crisis Services Branch" and the "Child Protective Services Branch." Under the deputy chief for Foster Care and Adoption would be the "Foster Care Services Branch" and the "Adoption Resources Branch." The deputy chief for Operations would be responsible for the Monitoring Unit, the WARD Tracking System, and other administrative functions. No document provided to the Court suggests any time frame for instituting the proposed realignment or any strategy for making it work to reduce caseloads and increase compliance with federal and District law. Nor did Ms. Andrews' testimony provide the Court with any guidance in this regard. Ms. Andrews testified that the plan was not in final form, but that she was aware of some administrative level changes due to take place in the next few weeks. She did not apprise the Court of the details of these changes.

The Court is encouraged that defendants are finally attempting to alleviate some of the deficiencies in the current system. Nevertheless, the Court simply does not have enough evidence detailing the proposed realignment in order to make a finding that the realignment will remedy all of the system's failures, which have been elaborately detailed above. No one has explained how specialization will reduce caseloads or when the specialization is to take place. The Court cannot ask plaintiffs to rely on defendants' good faith but as yet unsubstantiated promises to improve.

It is not sheer coincidence that the proposed realignment has been suddenly undertaken in the past few months. Based on the testimony of several of defendants' witnesses, it is clear that many of the District's steps toward improvement were instituted after discovery was largely completed, plaintiffs' experts had completed their reports, and the prospect of a full trial on the merits had become likely. It wasn't until June of 1990, eight months before trial, that the DHS hired someone to set up a training program for social workers, managers, and support staff within the CFSD. It wasn't until August of 1990, six months before trial, that the DHS established a Recruitment Unit within the CFSD, solely for the purpose of recruiting foster and adoptive homes. It wasn't until November of 1990, three months before trial, that the DHS began hiring social workers on a permanent, rather than temporary, basis. At the time of trial, there was still no concrete evidence that existing social workers had been converted to permanent positions, although the evidence indicated that a conversion was planned. It wasn't until January of this year, a month before trial, that the caseloads of social workers such as Chainie Scott were reduced.[23] It wasn't until the time of trial itself that the chief of the ICSB was asked to prepare a risk assessment tool for use during investigations of neglect reports. The person assigned this task admitted at trial that he was only "a little" familiar with the Child Welfare League standards concerning risk assessment. In short, the Court is concerned that the department's efforts to improve may have been motivated only by this litigation and, without continued litigation or a court order, the motivation for continued restructuring and improvement will subside.[24]

### 7. Harm to the Children

The Court has found that the DHS has, at least since 1987, consistently failed to comply with the requirements of the federal Adoption Assistance Act, the District's Abuse and Neglect Act, the CFSD Manual of Operations, and reasonable professional

---

**23.** As the Court has previously found, even after the reduction, the caseloads of the CFSD's social workers far exceed any reasonable professional standards and make it impossible for the social workers to effectively carry out their functions.

**24.** The Court's concerns are fueled by the fact that no written documentation on the goals, objectives, and methodology of the proposed realignment was supplied to the Court.

standards. Although common sense dictates that these widespread and systemic deficiencies have caused harm to the children in the District's foster care, plaintiffs have nevertheless introduced substantial uncontroverted evidence regarding the nature and scope of that harm.

### a. Harm to the Named Plaintiffs

Testifying on behalf of plaintiffs were four child psychiatrists. Each had examined one of the named plaintiffs, both personally and through a review of the child's case records. Each had an opinion regarding the harm that had resulted from the child's experience in foster care.

#### i. *LaShawn A.*

Dr. Harold Eist, a child psychiatrist who is on the faculty at Howard University and has treated over 5,000 inner city children, offered his opinion about the psychological and emotional stability of LaShawn A. La-Shawn came into custody in September 1986, when she was two-and-a-half years old. She was placed in voluntary care by her mother, who was homeless and could not care for LaShawn because of emotional problems. No services were offered to enable her to remain at home. LaShawn was placed in the foster home of a woman in her sixties who had no interest in adopting LaShawn. She had no contact with her natural family for at least two years after she came into care. During this period, a psychiatrist who examined her discovered potential psychiatric problems and developmental delays. She was placed in a therapeutic nursery in the summer of 1987. In November 1988, her mother visited her. In January and February 1989, LaShawn's mother failed to show up for scheduled visits. A subsequent visit from her mother did not go well. In April, she was visited by her father, who had been incarcerated when she entered foster care. LaShawn remained in emergency care status until May 1989, two-and-a-half years after her entry into the District's physical custody. A psychiatric evaluation conducted that month indicated she may have been experiencing an overuse of physical punishment and perhaps even sexual abuse in her fos-

ter home. At the time of trial, LaShawn remained in the same foster home.

Dr. Eist examined LaShawn in July 1990. He described her as an attractive, neatly groomed six-and-a-half-year-old who separated easily from the social worker who brought her to his office. He testified that LaShawn was frenetically hyperactive and lost concentration easily. Her developmental delays became evident when she could not play tic tac toe nor draw a straight line. When Dr. Eist asked her who loved her, LaShawn replied "no one." When he asked her who hated her, she said her foster mother. Dr. Eist testified that La-Shawn indicated that her foster mother beat her. Dr. Eist concluded that LaShawn suffered from "Attention Deficit Hyperactivity Disorder" (AD–HD), was severely emotionally delayed, and was overwhelmed by stimuli. He opined that her prognosis was grave and that she will likely experience four to six exacerbations of depression throughout her adulthood, lasting anywhere from one to four years each. Although Dr. Eist admitted that the cause of AD–HD is unknown and that there was evidence that LaShawn had psychological problems before entering foster care, he concluded that the mishandling of her case while in custody contributed to her disorders. He testified that LaShawn has benefited from the therapeutic nursery, but that she needs occupational training, additional support services, contact with her siblings, and a decision about her final placement. Dr. Eist opined that had LaShawn been in a caring family who lobbied for services to provide for her special needs, there is a strong likelihood that her AD–HD would not be as severe and her depression would be seriously ameliorated. The longer she remains with her current foster mother, according to Dr. Eist, the less she may be able to benefit from adoptive placement.

#### ii. *Leo C.*

Dr. Gordon Kirschner, a child psychiatrist with experience in psychoanalysis and the treatment of children, adolescents, and adults, reviewed the case records of Leo C. and examined him on July 18, 1990. Leo came into custody in 1982 when he was

two-and-a-half months old and his mother was admitted into a psychiatric facility. Although case workers almost immediately determined that Leo should be a candidate for adoption, the department returned Leo to his mother six months after he came into care. Leo's mother then had another baby, her fifth, in the fall of 1983. In May 1984, Leo's mother requested that he and his new brother, Gary, be placed in foster care while she sought psychiatric hospitalization. The children did not come into care, however, but were sent to stay with their maternal grandmother in June 1984. Later that month they were left with a neighbor who called the DHS to have them placed in emergency care. Leo and Gary remained in a foster home until February 1985, when their foster mother requested their removal. The children were returned to their mother. In June 1985, their mother placed them in voluntary care so she could be hospitalized for depression. After she left the hospital, the children were again returned to her. In 1987, the children again came into the District's custody and have remained there ever since. They were in an institution until late 1988, after which they were placed in a foster home. Since May 1989, both children have been on psychoactive medications to control their behavior. Their case goals remain "return home" even though their mother has been uncooperative and has not visited regularly. According to the testimony of Dr. Kirschner, the foster mother caring for Gary and Leo "dropped out of the picture" while they were at camp in the summer of 1989. They have been with their step-grandmother ever since.

Dr. Kirschner described Leo as notably unemotional and unattached to his step-grandmother, even though he had spent the previous 18 months living with her. Dr. Kirschner described him as cooperative, but inclined to change the rules of the games they played in order to suit himself. He testified that Leo suffered from AD–HD and developmental disorders and that Leo had a poorly formed internal representation of other people, including his mother and strangers. Dr. Kirschner opined that Leo's problems will continue into adulthood. He testified that he believed the frequent changes in Leo's living situation and the inadequacies of Leo's mother had caused many of Leo's difficulties. Had Leo been adopted by the time he was three, Dr. Kirschner opined, he would not have experienced the same disorders. Nevertheless, Dr. Kirschner believes Leo could still benefit from adoption.

### iii. *Robert D.*

Dr. Richard Gross, a child psychiatrist with extensive experience treating children in foster care, reviewed the records of and personally examined Robert D. This child came into care when he was 14 months old after his grandmother filed a report that he had been neglected. He was in foster care from January 25, 1980 until November 6, 1980, when he was returned to his mother. In January and February 1984, the department was notified by Robert's sister's school principal and by the Metropolitan Police Department's Youth Division that the family was in need of assistance. Nothing in the record indicates any visits by the assigned social worker until Robert entered emergency care in July 1985. After his first foster mother beat him, he was placed in a different foster home. He lived in this home from the fall of 1985 until 1988. The goal listed on Robert's April 1987 case plan was adoption. His mother signed an agreement relinquishing parental rights on June 1, 1987, but the agreement was never processed because it apparently was lost. Robert's May 1988 case plan inexplicably listed a goal of family reunification. In December 1988, Robert moved to his fourth foster home, where he remained until September 1989. Robert's April 1989 Disposition Report, written when he was 10 years old, states that his planning goal is long-term foster care. In late 1989, Robert was placed in a group home.

Dr. Gross described Robert as being concrete and literal in his thinking, exhibiting poor judgment and little enthusiasm. He testified that Robert had low self-esteem, felt no sense of belonging, and expressed an unusual fear and distrust of people. Robert refused to draw a picture of a per-

son or play with the doctor's puppets that looked like people. Dr. Gross testified that Robert told him "you can't trust people, they die in front of your face." According to Dr. Gross, Robert suffers from depression, adjustment disorders, and learning disabilities that are likely to follow him into adulthood and prevent him from undertaking normal life activities such as holding down a steady job. Dr. Gross opined that Robert's problems were caused by the early lack of a relationship with his mother and the continuing lack of a relationship with any single caregiving adult. Although Dr. Gross acknowledged that Robert's problems were fairly characteristic of children in foster care, he believed that placement in one continuous and appropriate foster home could have provided Robert with a greater chance of success. Similarly, Dr. Gross testified that he believes that if Robert had been adopted earlier, he would be a more integrated and successful child.

### iv. *Kevin E.*

Dr. William Clotworthy, Jr., a child psychiatrist who was the clinical director for the Christ Child Institute for Children for 15 years, reviewed the records of and personally examined Kevin E. With minor exceptions, Kevin has been in the District's custody for his entire life. He came into custody following his release from the hospital 20 days after he was born. Kevin is now 11 years old. He has been in 11 different placements, including foster homes, group homes, residential treatment facilities, and hospitals. At one time he was in a foster home with his mother, who was also in the District's custody. Kevin was not freed for adoption until he was eight years old. Kevin was hospitalized in 1988 after exhibiting behavior that included running away from home, head banging, suicidal thoughts, auditory hallucinations, and temper tantrums. He told hospital staff that he hated himself and he climbed into a trash can and asked to be thrown away. Kevin was placed in Villa Maria, a residential treatment facility in Baltimore, Maryland, in the fall of 1988. Reports from the institution in 1989 indicate that he might not be able to tolerate the intensity of a family setting due to his history of abandonment. Although adoption has been Kevin's planning goal for much of his life, his case has never been referred to the Adoption and Placement Resources Branch.

Dr. Clotworthy examined Kevin on July 30, 1990. He described Kevin as engaging, articulate, and cooperative, but with a severe case of AD–HD. According to Dr. Clotworthy, Kevin was easily distracted and frustrated, had poor impulse control, and suffered from mild learning disabilities in the form of speech and language delays. Dr. Clotworthy testified that the record revealed Kevin's low self-esteem and difficulty trusting people. Dr. Clotworthy opined that these conditions are likely to be long-lasting and that Kevin's tendency to react strongly to both hard and medium "bumps along his road" may affect his ability to hold a job. Dr. Clotworthy testified that he believed that the frequent changes in placements were each interpreted by Kevin as being his fault and signifying that something was wrong with him. Each was an enormous blow. Dr. Clotworthy opined that if social workers had been attuned to his special needs earlier, the outcome for Kevin could have been quite different. In Dr. Clotworthy's opinion, Kevin was moved at inappropriate times, was returned to his mother inappropriately, was not prescribed medication early enough (to control his depression and hyperactivity), and was generally not provided with the help he needed to be a success in school or at other endeavors. Dr. Clotworthy testified that any trained social worker should have realized his needs much earlier and realized that there was no chance of returning him to his mother. Dr. Clotworthy expects Kevin to experience regression and an increase in symptoms when he is forced to leave Villa Maria.

### b. Harm to the Plaintiff Class

The uncontroverted testimony of Dr. Eist, Professor Walker, Dr. Williams, and other of plaintiffs' experts leads the Court to find that regular, constant, reliable relationships with adults are critical to the development of children. For children in foster care, regular visits with their social

workers, parents, and siblings are crucial if there is to be any chance of reunification. Without such visitation, children are unable to develop a sense of safety, confidence, and trust. If the parents are uncooperative or unwilling to visit regularly and accept parental responsibility, social workers should expeditiously move toward adoption by gathering the necessary materials for terminating parental rights. Prolonged stays in foster care and frequent changes in placements lead to the disorders suffered by the named plaintiffs all too frequently. As Dr. Gross testified, Robert's problems are fairly characteristic of other children in the foster care population. Based on the foregoing, the Court finds that the children in the District's foster care have been and continue to be irreparably harmed—psychologically, emotionally, and sometimes physically—by the inappropriate treatment they have received while in that care.

Those who are not in the District's custody but who have been the subject of reports of neglect have also been harmed. Dr. Stein's case reading contains examples of 11 cases for which reports were substantiated but no services provided. In the most extreme case, a child died after his mother failed to keep him on a heart monitor made necessary by his medical problems. Prior to releasing the child to his mother, the CFSD had been made aware of the mother's lack of contact with the child while he was hospitalized. The homicide detective's report, made after the child's death, noted that the mother's apartment was dirty, without running water, and was littered with drug paraphernalia. The child showed signs of having been choked. In less extreme cases, children are forced to live in filthy, rodent-infested homes that lack electricity or running water. They are often in the presence of drug use and are not fed regular meals. Based on the foregoing, the Court finds that those plaintiffs who have been the subject of a report of neglect but remain in the home have been and continue to be harmed by the District's failure to provide preventive services.

## C. Summary of Findings

To summarize, in the foregoing discussion, the Court found the following:

1. The average stay for children in the District's foster care system is 4.8 years, over twice the national average.

2. The CFSD has, since at least the beginning of 1988, continuously failed to initiate investigations into reports of neglect or abuse within 24 hours and complete investigations within two weeks.

3. The CFSD has consistently failed to use "reasonable efforts" to prevent the removal of children from their homes or to provide the services necessary to reunite them with their families when removal cannot be avoided.

4. Children in the CFSD's physical custody have consistently remained in voluntary or emergency care beyond 90 days without the filing of a neglect petition and beyond 180 days without a judicial determination that placement is in their best interests.

5. The CFSD has consistently failed to place children in the least restrictive placements in close proximity to their families and consistent with their needs.

6. The CFSD has frequently assigned children in its custody inappropriate case goals and has consistently failed to prepare written case plans to enable the children to realize their goals.

7. The CFSD has consistently failed to provide services once children are removed from the home and placed in foster care.

8. The CFSD has consistently failed to expedite the progression of children in its custody toward permanent placement through adoption and has failed to timely refer children whose goal is adoption to the Adoption and Placement Resources Branch.

9. The CFSD has consistently failed to ensure that the children in its custody receive timely judicial and administrative reviews regarding the continued necessity and appropriateness of placement.

10. The CFSD's automated information system, the WARD Tracking System, is wholly inadequate for keeping track of the

number and location of children in the District's custody and their needs.

11. The caseloads handled by CFSD social workers have consistently exceeded reasonable professional standards and prevented the CFSD from carrying out its responsibilities under federal and District law.

12. Extreme staff shortages have consistently resulted in CFSD supervisors carrying caseloads rather than training and monitoring their employees.

13. The CFSD's Monitoring Unit has consistently failed to monitor and inspect foster homes and institutions on a yearly basis.

14. The DHS has consistently failed to use its funding in the most cost-effective manner and has consistently failed to maximize its federal funding by failing to make the administrative changes necessary to qualify for such funding.

15. Each of the named plaintiffs, as well as the rest of the members of the plaintiff class, have been and continue to be psychologically, emotionally, and physically harmed by the actions and inactions of defendants.

16. Management personnel at all levels of the DHS, as well as the former mayor, have repeatedly been advised about the department's deficiencies and inability to comply with federal and local law.

17. The DHS's proposed realignment, although a positive step toward improvement, is still too tentative to moot this case or make injunctive relief unnecessary.

## III.

### CONCLUSIONS OF LAW

Plaintiffs bring their complaint under 42 U.S.C. § 1983, alleging that the District operates its child welfare system in violation of the federal Adoption Assistance and Child Welfare Act of 1980 and Child Abuse Prevention and Treatment Act, as well as the fifth amendment to the Constitution. Plaintiffs also allege that the District is violating its own statutes: the Prevention of Child Abuse and Neglect Act of 1977 and the Youth Residential Facilities Licensure Act of 1986. Plaintiffs seek injunctive relief only.

Section 1983 of Title 42 of the United States Code provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and law, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

### A. Standard for § 1983 Liability

■■ The seminal case establishing that municipalities may be held liable under § 1983 is *Monell v. Dep't of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).[25] In that case, the Supreme Court held that although "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents," it may be held liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694, 98 S.Ct. at 2037–38. Defendants argue that the District cannot be held liable unless the alleged unconstitutional action " 'implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by the body's officers.' " Defendants' Trial Brief at 9 (quoting *Monell*, 436 U.S. at 690, 98 S.Ct. at 2036). Defendants ignore the next sentence of the *Monell* decision, however, which makes it clear that "local governments, like every other § 1983 'per-

---

**25.** It should be noted that, although the District of Columbia is not a named defendant in this action, the mayor is named in her official capacity. Because the mayor is, in essence, the individual embodiment of the District, the Court does not find that the failure to name the District as a defendant affects its analysis of the applicability of § 1983.

son,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." 436 U.S. at 690–91, 98 S.Ct. at 2036. What matters is that the policy or custom is "the moving force of the constitutional violation." *Id.* at 694, 98 S.Ct. at 2038.

■ This circuit has elaborated on the *Monell* inquiry, holding that to establish municipal liability under § 1983, a plaintiff must prove the existence of "a persistent, pervasive practice, attributable to a course deliberately pursued by official policy-makers, one that caused the deprivation of constitutional rights plaintiff experienced." *Carter v. District of Columbia, et al.,* 795 F.2d 116, 125–26 (D.C.Cir.1986). The Court will use this legal standard to review the alleged statutory and constitutional violations in this case.

## B. Alleged Statutory Violations

### 1. *Applicability of § 1983*

■ The Supreme Court has repeatedly held that § 1983 provides a federal remedy for violations of federal statutory rights as well as constitutional rights. *See Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, ——, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989); *Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980). The test for determining whether § 1983 provides a remedy for any particular statutory violation is two-part: first, "the plaintiff must assert the violation of a federal right," *see Golden State Transit Corp.,* 493 U.S. at ——, 110 S.Ct. at 448, and second, Congress must not have specifically foreclosed the § 1983 remedy. *Id. See also Thiboutot,* 448 U.S. at 19, 100 S.Ct. at 2512. Whether a federal right has been violated depends upon whether the statute in question creates "obligations binding on the governmental unit" that are not " 'too vague and amorphous' to be 'beyond the competence of the judiciary to enforce' " and that are " 'inten[ded] to benefit' the putative plaintiff." *Golden State Transit Corp.,* 493 U.S. at

——, 110 S.Ct. at 448 (quoting *Wright v. Roanoke Redevelopment and Housing Authority,* 479 U.S. 418, 431–32, 430, 107 S.Ct. 766, 774, 773, 93 L.Ed.2d 781 (1987)).

■ Defendants have argued that the federal statutes relied upon by plaintiffs merely establish state grant programs and do not create actionable rights under § 1983. This argument is contrary to existing law. In *Lynch v. Dukakis,* 719 F.2d 504 (1st Cir.1983), the First Circuit applied the two-part test to alleged violations of the same statute at issue in this case, the federal Adoption Assistance Act. The court held that the Act confers enforceable rights upon children in the custody of states receiving federal funding under the Act. In so holding, the First Circuit relied on numerous Supreme Court decisions since 1968 that "implicitly and explicitly" have held that the rights under various provisions of the Social Security Act are privately enforceable under § 1983. 719 F.2d at 510 (citing cases). Having determined that the Adoption Assistance Act conferred an enforceable right, the First Circuit went on to determine that Congress had not foreclosed the § 1983 remedy by authorizing the Secretary of the Department of Health and Human Services to withhold or reduce federal funding under the Act when a state does not comply with its requirements. The court rejected the defendants' arguments that a cutoff in funding was the sole remedy under the Act. Instead, the First Circuit held that the issue was governed by *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), in which the Supreme Court held that:

> We have considered and rejected the argument that a federal court is without power to review state welfare provisions or prohibit the use of federal funds by the States in view of the fact that Congress has lodged in the Department of HEW the power to cut off federal funds for noncompliance with statutory requirements. We are most reluctant to assume Congress has closed the avenue of effective judicial review to those indi-

viduals most directly affected by the administration of its program.

397 U.S. at 420, 90 S.Ct. at 1222.

More recently, the Fourth Circuit upheld the enforceability of the Adoption Assistance Act through § 1983 in *L.J. By and Through Darr v. Massinga,* 838 F.2d 118 (4th Cir.1988), *cert. denied,* 488 U.S. 1018, 109 S.Ct. 816, 102 L.Ed.2d 805 (1989). The Fourth Circuit held that the provisions of the Act:

> spell out a standard of conduct, and as a corollary rights in plaintiffs, which plaintiffs have alleged have been denied. It is true that the statutes are largely statutes relating to appropriations, but, defendants' argument to the contrary notwithstanding, they are privately enforceable under 42 U.S.C. § 1983.

838 F.2d at 123. The court went on to uphold the district court's grant of a preliminary injunction ordering defendants to "submit a plan for review of foster homes about which a report of maltreatment has been made, to monitor child placements in foster homes at least monthly and in some instances weekly, to expand its medical services to foster children including the keeping of medical records, and to provide prompt written reports of maltreatment of foster children to their attorneys and the juvenile court...." *Id.* at 120. *See also Lesher v. Lavrich,* 784 F.2d 193, 197 (6th Cir.1986) (holding plaintiffs not entitled to damages for alleged violations of Adoption Assistance Act but agreeing with *Lynch* that "[i]t may be reasonable to read the [Act] to permit parents and children affected by the programs it funds to sue to force those programs to comply with the federal funding requirements").

This Court finds the reasoning of the First and Fourth Circuits persuasive. It would strain logic to hold that plaintiffs, as the intended beneficiaries of the Adoption Assistance Act, nevertheless are precluded from enforcing their rights under the Act. Moreover, the provisions of the Act itself persuade the Court that the Act creates enforceable rights. These provisions are extraordinarily specific, spelling out exactly what a state must do for children in its care in order to receive funding under the Act. Based on this, the Court holds that the Adoption Assistance Act, by its terms, "creates obligations 'sufficiently specific and definite' to be within 'the competence of the judiciary to enforce,' ... is intended to benefit the putative plaintiffs, and is not foreclosed 'by express provision or other specific evidence from the statute itself.'" *Golden State Transit Corp.,* 493 U.S. at ——, 110 S.Ct. at 449 (citing *Wright v. Roanoke Redevelopment and Housing Authority,* 479 U.S. 418, 432, 423, 107 S.Ct. 766, 774, 770, 93 L.Ed.2d 781 (1987)).

### 2. *Defendants' Violations*

■ Having determined that § 1983 is available to enforce rights conferred by the Adoption Assistance Act, this Court must determine whether the District, by virtue of an official policy or custom, has deprived plaintiffs of those rights. The Court has recited countless facts which undeniably establish that plaintiffs are being deprived of rights conferred upon them by the federal statute. In almost every area of the federal law, the District's child welfare system is deficient. It fails to investigate reports of abuse and neglect in a timely manner; it fails to provide services to children and families; it fails to make appropriate foster care placements; it fails to develop case plans; and it fails to assure a permanent home for the children in its care, among other things. The Court has already found that these failures have terrible consequences for the children in the District's custody as well as for those who are known to the District because of reports of neglect or abuse. In one tragic case, these failures resulted in an infant's death. The Court has also found that the upper management of the DHS, as well as the former mayor, have been repeatedly made aware of most, if not all, of the system's failures. At one point, having been repeatedly advised that children were at risk due to severe staff shortages and excessive caseloads, the mayor promised to hire more social workers so that the CFSD could carry out its responsibilities. This promise never materialized.

Defendants have pointed out that the District's official policy is embodied in its

statutes, which largely follow the mandates of the Adoption Assistance Act. Although the Court agrees that the District's statutes may be its "official policy," it does not represent the actual practice in the District. The court in *Lynch v. Dukakis*, 719 F.2d 504 (1st Cir.1983), addressed and rejected a similar argument. In that case, defendants argued that review was precluded because the Massachusetts statute and regulations were consistent with federal law. The court held that § 1983 applies to state "custom or usage" just as it does to state statutes. Therefore, the court held, "[i]f Massachusetts's practice is to deprive foster children of federal statutory rights, even though the state's law on the books requires otherwise, section 1983 is available as a remedy." 719 F.2d at 511. The situation is the same in this case. Based on the overwhelming evidence, the Court can conclude nothing less than that the District's failures amount to a "persistent, pervasive practice, attributable to a course deliberately pursued by official policy-makers." *Carter v. District of Columbia, et al.*, 795 F.2d 116, 125–26 (D.C.Cir. 1986). Accordingly, the Court holds that the District has been and continues to be depriving plaintiffs of federal statutory rights in violation of § 1983 of Title 42 of the United States Code.

## C. Alleged Constitutional Violations

### 1. *The Need to Reach the Constitutional Claims*

Although the Court is mindful of the longstanding admonishment to refrain from reaching constitutional issues unnecessarily, the nature of the relief sought in this case makes a resolution of the constitutional claims of the children in the District's foster care unavoidable. By holding that the District has violated only these children's *statutory* rights, the Court is limited to granting only conditional relief. If the District decides to simply forego federal funding under the Adoption Assistance Act, the Court would have no basis for enforcing any injunction it might order. This limitation was noted by the district court in *Lynch v. King*, 550 F.Supp. 325 (D.Mass.1982), *aff'd, Lynch v. Dukakis*, 719 F.2d 504 (1st Cir.1983). In that case, the court issued a preliminary injunction ordering the state to provide written case plans, ordering a cap on the number of cases a social worker can have at any time, and ordering other specific relief. The district court noted, however, that the relief was limited to "an order compelling state officials to give up some of those resources—funds appropriated by Congress—if federal requirements are not met." 550 F.Supp. at 327.[26] *See also Rosado v. Wyman*, 397 U.S. 397, 420, 90 S.Ct. 1207, 1221, 25 L.Ed.2d 442 (1970) (holding that plaintiffs who challenged the state's plan for making payments pursuant to the federal Aid to Families with Dependent Children program were entitled to declaratory relief and an appropriate injunction against the payment of federal monies if the state did not develop a plan that conformed with the statute in a reasonable

---

**26.** Despite the limit of this relief, the court in *Lynch* chose not to address plaintiff's constitutional claims at that time. It held, however, that "[i]f defendants choose not to participate in the program for supplemental funds ..., or fail to submit a revised plan demonstrating their compliance with the requirements of [the Act], they will be restrained from spending supplemental funds allotted under [the Act]. In addition, plaintiffs may apply to the court for a hearing on their constitutional claims." 550 F.Supp. at 354. Unlike this case, which has proceeded through a full trial on the merits, the decision in *Lynch* was made at the preliminary injunction stage, after which the parties entered into a settlement.

In the more recent decision in *L.J. By and Through Darr v. Massina*, No. 84-4409 (July 27, 1987) (reprinted as Addendum B to *L.J. By and Through Darr v. Massina*, 699 F.Supp. 508 (1988)), *aff'd*, 838 F.2d 118 (4th Cir.1988), *cert. denied*, 488 U.S. 1018, 109 S.Ct. 816, 102 L.Ed.2d 805 (1989), the Maryland district court was not so reluctant to address the constitutional issues at the preliminary injunction stage. That court first established that defendants, including the Baltimore City Department of Social Services (BCDSS), had a constitutional duty to protect the children in the city's foster care custody. The court then held that due to the "systemic nature of the BCDSS failure to perform that duty," the plaintiffs were likely to succeed on the merits of their constitutional claims. 699 F.Supp. at 539–40.

amount of time, but noting that the state is free to use only state funds according to whatever plan it chooses, providing it does not violate the Constitution).

If this Court orders relief for the District's statutory violations only, the District could simply give up its federal payments in order to relieve itself of a burdensome court order. Plaintiffs would then be left with no effective relief. Because the Court may grant only conditional relief for defendants' statutory violations, the Court will proceed to reach plaintiffs' constitutional claims.

### 2. *The Legal Standard*

■ Plaintiffs allege that they are being deprived of their due process rights under the fifth amendment, including: (1) the right not to be harmed while in state custody, (2) the right to placement in the least restrictive, most appropriate placement, (3) the right to care that is consistent with competent professional judgment, and (4) the right not to be deprived of state or federally created liberty or property rights without due process. Complaint at ¶ 130. As the Court has previously articulated, to establish a constitutional violation under § 1983, plaintiffs must prove that the alleged unconstitutional action amounts to an official policy or custom and that a causal link exists between the policy or custom and the alleged harm. *See Monell v. Dep't of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Morgan v. District of Columbia*, 824 F.2d 1049, 1058 (D.C.Cir.1987); *Carter v. District of Columbia, et al.*, 795 F.2d 116, 125–26 (D.C.Cir.1986).

Before the Court can apply this standard to the facts of this case, it must determine whether defendants' actions or nonactions are indeed unconstitutional. This issue has never been conclusively determined by any of the district courts or circuits that have entertained similar child welfare suits.

The biggest obstacle to plaintiffs' constitutional claims is the case of *DeShaney v. Winnebago County Dept of Social Services, et al.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). The case involved a young boy who was not in the state's custody but had been brought to the state's attention through reports of abuse. After the state social services agency became aware of the boy and established a "Child Protection Team" to recommend measures for his protection, the boy's father beat him so severely that he will require institutionalization for the rest of his life. The boy's mother sued under § 1983 on his behalf, arguing that the state had acquired a duty to protect her son because it knew of the danger of abuse to him and had undertaken efforts to provide for his protection. Having entered this "special relationship" with the boy, the mother argued that the state had a duty to protect him competently.

The Supreme Court rejected these arguments, holding that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." 489 U.S. at 195, 109 S.Ct. at 1003. The Court reiterated its prior holdings that the due process clause does not confer an affirmative right to governmental aid. *See Youngberg v. Romeo*, 457 U.S. 307, 317, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982); *Harris v. McRae*, 448 U.S. 297, 317–18, 100 S.Ct. 2671, 2688–89, 65 L.Ed.2d 784 (1980); *Lindsey v. Normet*, 405 U.S. 56, 74, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972).

*DeShaney* is distinguishable from the case at bar for two reasons. First, the Court in *DeShaney* acknowledged that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." 489 U.S. at 199–200, 109 S.Ct. at 1005. The Court continued by noting that "[h]ad the State by the affirmative exercise of its power removed Joshua from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect." *Id.* at 201 n. 9, 109 S.Ct. at 1006 n. 9. Clearly this is the situation for the plaintiffs in this case

who have entered into the District of Columbia's custody.

The second distinguishing factor is that the plaintiffs in this case argue that the District's statutes and policies create constitutionally protected liberty and property interests. The District's violation of these statutes and policies, so their argument goes, violates the due process rights of the children in foster care. This argument was not considered by the Supreme Court in *DeShaney* because it had not been pleaded in the courts below. *See* 489 U.S. at 195 n. 2, 109 S.Ct. at 1003 n. 2 (noting that the entitlement argument was made for the first time in petitioners' Supreme Court brief and thus declining to consider it). Whether either of these distinguishing factors opens the door to holding the District liable for constitutional violations depends upon the scope of plaintiffs' liberty interests and the scope of the defendants' duty to prevent the deprivation of those interests.

a. Scope of Plaintiffs' Liberty Interests

Plaintiffs' constitutional claims are brought pursuant to the fifth amendment to the Constitution, which is applicable to the District of Columbia in the same way as the fourteenth amendment is applicable to the states. The fifth amendment protects persons from being deprived of liberty interests without due process of law. Plaintiffs have asserted that they have liberty interests in freedom from harm while in state custody, placement in the least restrictive, most appropriate foster care placements, and receiving care that is consistent with competent professional judgment.

■ It is indisputable that plaintiffs have a liberty interest in safe conditions while in state custody. Even convicted criminals subject to state or federal punishment have an interest in their physical security. *See Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). Although the scope of plaintiffs' liberty interest is not entirely clear, the Supreme Court has indicated that it is broader for those in the civil custody of the state than for those in the state's criminal custody.

In *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), plaintiff, an involuntarily committed mentally retarded adult, complained that he had suffered repeated injuries and had been subjected to physical restraints while in the state's custody. The Supreme Court held that the plaintiff had liberty interests in reasonably safe conditions and freedom from bodily restraint. *Id.* at 315–16, 102 S.Ct. at 2457–58. The Supreme Court then turned to plaintiff's claim that he had a right to minimal training in the development of necessary skills. The Court noted that although a state has no general constitutional duty to provide substantive services to its citizens, *see Harris v. McRae*, 448 U.S. 297, 318, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), a duty may arise when a person is in the state's custody and is dependent upon the state for care. *Youngberg*, 457 U.S. at 317, 102 S.Ct. at 2458. The Supreme Court then held that the plaintiff's liberty interests "require the State to provide minimally adequate or reasonable training to ensure safety and freedom from undue restraint." *Id.* at 319, 102 S.Ct. at 2460. The Court did not need to resolve "the difficult question whether a mentally retarded person, involuntarily committed to a state institution, has some general constitutional right to training *per se*, even when no type or amount of training would lead to freedom." *Id.* at 318, 102 S.Ct. at 2459 (footnote omitted).

The Court finds the rights of children in foster care to be analogous to the rights of the involuntarily committed. That is, they have a right to reasonably safe placements in which they will not be harmed.[27] This

27. This holding is supported by the decisions of the District Court of Maryland and the Fourth Circuit. In *L.J. By and Through Darr v. Massina*, No. 84–4409 (July 27, 1987) (reprinted as Addendum B to *L.J. By and Through Darr v. Massina*, 699 F.Supp. 508 (1988)), *aff'd*, 838 F.2d 118 (4th Cir.1988), *cert. denied*, 488 U.S. 1018, 109 S.Ct. 816, 102 L.Ed.2d 805 (1989), the district court held that the defendants, including the Baltimore City Department of Social Servic-

right is not limited to safety from physical harm, although there are certainly instances in which the plaintiffs in this case have been physically harmed. This right extends to safety from psychological and emotional harm. *See Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (mental and emotional distress is a cognizable injury under § 1983). *See also DeShaney*, 489 U.S. at 198, 109 S.Ct. at 1005 (once in custody, state has constitutional "duty to assume some responsibility for [a child's] safety and general well-being"). Whether plaintiffs have a liberty interest in any specific services is a more difficult question, analogous to the question of training addressed by the Supreme Court in *Youngberg*. In addressing this question, it is important to keep in mind that plaintiffs did not come into the District's care by choice. They are wards of the District who rely wholly on the District to provide them with all of life's necessities. They are children and rely on the District to protect them from harm and ensure their well-being. To the extent that certain services, such as appropriate placements and case planning, are essential to preventing harm to the children in the District's custody, this Court holds that the children have a constitutional liberty interest in those services. This delimitation of the scope of plaintiffs' liberty interest is consistent with the decision in *Youngberg*, wherein the Supreme Court limited the plaintiff's liberty interest in training to just that training necessary to ensure his safety and freedom from bodily restraint.

Plaintiffs' interests also derive from the District's own statutes and regulations, which provide precise directives to the DHS for the operation of its child welfare system. To the extent these statutes and regulations confer benefits upon the plaintiffs in the District's foster care, the deprivation of those benefits takes on constitutional dimensions. In *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court held that the requirements of procedural due process apply to deprivations of liberty and property interests. According to the Court, property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.*

The Eleventh Circuit relied in part on *Roth* to reverse a district court's dismissal of a foster child's § 1983 complaint in *Taylor By and Through Walker v. Ledbetter*, 818 F.2d 791 (11th Cir.1987) (*en banc*), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989). In that case, the appellate court determined that the Georgia statutes regarding foster care and placement conferred benefits upon children in the care of the state. Specifically, the court held that

[T]he Georgia scheme mandates that officials follow guidelines and take affirmative actions to ensure the well being and promote the welfare of children in foster care. These children can state a claim based upon deprivation of a liberty interest in personal safety when the officials fail to follow this mandate....

It is no moment that the state officials are not charged in this case with affirmatively acting to harm this child. What the child is entitled to is the state's protection from harm. She is entitled to be protected in the manner provided by statute. It would be anomalous if the state,

es, had entered into a "special relationship" with the children in the city's foster care custody. By virtue of this special relationship, defendants had acquired an affirmative duty to protect the plaintiff foster children. The court went on to hold that the systemic nature of defendants' failure to carry out its duty warranted preliminary injunctive relief.

On appeal, the Fourth Circuit held it unnecessary to reach the merits of plaintiffs' constitutional claims but it noted that "[d]efendants do not seriously contend with respect to prospective relief that if plaintiffs prove their allegations, which they have already demonstrated have an arguably solid foundation, plaintiffs will have proven a violation under the Fourteenth Amendment." 838 F.2d at 122. Plaintiffs in *L.J.*, like the plaintiffs in this case, had alleged that systemic deficiencies in the city's foster care system violated the Adoption Assistance Act and the Constitution and resulted in irreparable harm to the city's foster children.

in allegedly acting to protect the child, could itself cause harm to the child by failing to assume the child's minimal safety. Failing to act may, under certain circumstances, be more detrimental than acting.

818 F.2d at 799–800. The Georgia statutes at issue in *Taylor* provided a comprehensive scheme governing the state's foster care system. The District's statutes are also comprehensive, requiring the following, among other things: investigations of neglect within 24 hours, D.C.Code Ann. § 6–2102(b); preparation of a plan for each child and family for whom there is a substantiated report of neglect, *id.* at § 6–2107; limited 90–day stays in emergency placement, *id.* at § 6–2123; placements in the "least restrictive" settings, "consistent with the best interest and special needs of the child," CFSD Manual of Operations at § 602.5(a); and the licensure and yearly inspection of youth residential facilities, including foster homes, D.C.Code Ann. at §§ 3–802 and 3–805. *See also* Part I, *supra* (outlining mandates of federal and District statutes).

The Eleventh Circuit's reasoning in *Taylor* provides compelling support for this Court's definition of the scope of the liberty interests of the plaintiffs who are in the District's foster care custody. The Court is reluctant, however, to rely wholly on the District's statutes as the source of constitutional liberty interests for those plaintiffs who are not in the District's custody.[28] The Court recognizes that this issue was explicitly left open by the Supreme Court in *DeShaney v. Winnebago County Dep't of Social Services, et al.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), which made it clear that the state does not have a general constitutional duty to protect the liberty interests of children who are not in its custody. Without further guidance, the Court is unwilling to hold that the District has acquired such a duty solely by virtue of its own statutes and regulations. Nevertheless, it is without question that the District has neglected its *statutory* duties, under both federal and local law, to all of the children in the plaintiff class, including those who are not in the District's foster care custody.

### b. Scope of Defendants' Constitutional Duty

In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Supreme Court held that determining whether the plaintiff's constitutional rights have been violated requires balancing the plaintiff's liberty interests against any relevant state interests, including fiscal constraints and administrative burdens. *Id.* at 321, 102 S.Ct. at 2461. The standard for conducting this balancing is not whether the state's interest is "compelling" or "substantial," but whether the state exercised professional judgment in choosing what action to undertake. It is not for the court to " 'specify which of several professionally acceptable choices should have been made.' " *Id.* at 321, 102 S.Ct. at 2461 (quoting the Third Circuit's opinion in the same case, 644 F.2d 147, 178 (3d Cir.1980)). Rather, "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323, 102 S.Ct. at 2462. Under this standard, the

---

**28.** Although many of the plaintiffs in this case are in the District's custody, others remain in the home or in the care of friends or relatives after having been the subject of a report of abuse and neglect. The plaintiff class is defined as:

All children who, as the result of alleged or suspected abuse or neglect, are in the legal and/or physical custody of the District of Columbia Department of Human Services; and the presently-identifiable children who are not in the Department's legal or physical custody but who have been the victims, or are

at risk, of neglect or abuse of which the Department knows or should know as a result of notice to or filings with the Department; not including, however, any member of the class certified in *Bobby D. v. Barry,* Civil Action Misc. No. 16–77 (D.C.Super.Ct. July 7, 1980), who remains in the foster-care custody of the Department of Human Services, with respect to those issues addressed by the judgment entered in that action.

*LaShawn A., et al. v. Barry, et al.,* No. 89–1754, Order Granting Class Certification (January 22, 1990).

Constitution places a duty upon state agencies to exercise professional judgment when carrying out their responsibilities. The Supreme Court acknowledged in a footnote that expert testimony may be relevant for determining whether an agency's decisions substantially depart from the requisite professional judgment. *Id.* at 323 n. 31, 102 S.Ct. at 2462 n. 31.

The *Youngberg* case began its journey to the Supreme Court when the district court instructed the jury that they could hold defendants liable only if they found defendants to be "deliberately indifferent" to the serious medical and psychological needs of the plaintiff. This "deliberate indifference" standard was adopted by the Supreme Court in *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), a case involving prisoners' rights to be free from "cruel and unusual" punishment under the eighth amendment. After the jury found defendants liable, the case was appealed to the Third Circuit, which reversed and remanded, holding that the eighth amendment standard was inapplicable. The Third Circuit, however, could not agree on the appropriate standard for review. Recognizing the importance of this question, the Supreme Court granted certiorari. The Supreme Court then adopted the "professional judgment" standard set forth above, holding that the district court had erroneously instructed the jury on the eighth amendment deliberate indifference standard.

Since *Youngberg,* two circuits have had the occasion to consider the two standards in the context of cases involving children in state custody. In *Doe v. New York City Dept. of Social Services,* 649 F.2d 134 (2d Cir.1981), *after remand,* 709 F.2d 782 (2d Cir.), *cert. denied sub nom., Catholic Home Bureau v. Doe,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983), the Second Circuit reversed the district court's grant of a J.N.O.V. after a jury returned a verdict in favor of a plaintiff who had been physically and sexually abused by her foster father. The Second Circuit held that government officials could be held liable under § 1983 for inaction, as well as for affirmative action, in violation of law. In

its first decision, prior to the Supreme Court's decision in *Youngberg,* the Second Circuit held that deliberate indifference was a prerequisite to § 1983 liability. 649 F.2d at 141. In its second decision, after remand and after *Youngberg,* the Second Circuit acknowledged that the Supreme Court had articulated a different standard for institutionalized plaintiffs. Because the appeal had been brought by the defendants, however, the court did not have to determine which standard to apply. The court instead noted that "[e]ven if the [*Youngberg* ] standard of liability is applicable outside of an institutional setting, it is not more favorable to the [defendants] than the deliberate indifference test that was applied.... Consequently, we reject the [defendants'] assertion that the [*Youngberg* ] decision has effected a change in the controlling law so as to make our prior decision clear error...." 709 F.2d at 790. Because the Second Circuit was not presented with an opportunity to decide whether *Youngberg* applies to children in foster care, this Court does not find its decision controlling.

In *Taylor By and Through Ledbetter,* 818 F.2d 791 (11th Cir.1987) (*en banc* ), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989), decided well after *Youngberg,* the Eleventh Circuit again applied the deliberate indifference standard to a § 1983 case involving a child in foster care. The court, in reversing in part the lower court's dismissal of the complaint, held that a child in foster care may prevail under § 1983 "only where it is alleged and the proof shows that the state officials were deliberately indifferent to the welfare of the child." 818 F.2d at 797. At the same time, the Court acknowledged the similarities between the liberty interests of a child in foster care and the liberty interests of the plaintiff in *Youngberg.* The court specifically declined to address the merits of the child's claim, stating that "[w]hether the child's claim constitutes a liberty interest protected by the due process clause when weighed against the demands of society will be determined at later stages in these proceedings." 818 F.2d

at 795. This Court finds the *Taylor* opinion to be ambiguous. Because the Eleventh Circuit did not explain the relationship between the *Youngberg* standard and the "deliberate indifference" standard, the Court finds little guidance in its decision.

■ Faced with no clear precedent, it is for this Court to determine whether the *Youngberg* professional judgment standard applies to children in the state's foster care custody. The Court finds plaintiffs in this case to be in a much closer position to the plaintiff in *Youngberg* than to an incarcerated prisoner. As the *Youngberg* decision recognizes, the rights of a person in the civil custody of the state are greater than the rights of a person in the state's criminal custody. The foster children that make up the plaintiff class in this case have done society no wrong and they deserve no punishment. It would be inappropriate to force them to endure constitutional deprivations absent a showing of "deliberate indifference" by their caretakers. At the same time, it would be inappropriate to hold caretakers liable for constitutional deprivations when those caretakers had exercised their professional judgment in determining the best course of conduct. Thus, this Court will judge the defendants' liability based on whether they have exercised competent professional judgment in the administration of the District's child welfare system.[29]

### 3. Defendants' Violations

■ The Court has held that the plaintiffs in the District's foster care have liberty interests in personal safety and freedom from harm. The facts of this case establish beyond any doubt that defendants have failed to protect these plaintiffs from harm—whether physical, psychological, or emotional—by failing to place plaintiffs appropriately, failing to prepare case plans, failing to monitor placements, and failing to ensure permanent homes, among other things. Plaintiffs have established these failures in the same way they established defendants' statutory violations: through the experts' reports and testimony, the histories of the named plaintiffs, various DHS documents and reports, the testimony of high-level DHS officials, and the defendants' own admissions.

The defendants have admitted that, for certain periods of time, up to 75 percent of the children in voluntary or emergency care had been in that status for longer than 90 days without the filing of a neglect petition. This status is a form of legal limbo, in which children are suspended with no efforts made to reunite them with their families or to place them in permanent adoptive homes. The defendants have admitted that the CFSD's social workers are unable to closely monitor families or make regular visits to the children for whom they are responsible. This widespread deficiency contributes to the CFSD's perpetual state of crisis. The defendants have admitted that the CFSD does not have adequate medical screening facilities for children coming into its care. The risk of harm to these children, as well as to those they may be placed with, is unacceptable. The defendants have admitted that the CFSD often fails to refer children for adoption even when all hope for family reunification is gone. In at least one case, the CFSD lost a relinquishment agreement, signed by a neglected child's natural mother, that would have freed the child for adoption and paved the way for a permanent family. That child remains in the District's custody. The defendants have admitted that the CFSD has no reliable automated means of tracking the location of children in its care. When a child is referred for placement, a social worker must start calling foster homes to determine whether they have a vacancy. The defendants have admitted

---

**29.** The Court is also persuaded to reach this conclusion based on the nature of this case. This is not a case like *Doe* or *Taylor* in which the plaintiff seeks money damages. In such cases, a deliberate indifference standard may be warranted due to the chilling effect that an unfavorable judgment may have on municipal policymakers. Plaintiffs in this case seek injunctive relief only. In seeking such specific relief, it is particularly appropriate to consider whether the treatment plaintiffs are currently receiving is the result of competent, professional decisionmaking.

that the CFSD does not regularly inspect the foster homes and institutions in which its wards are placed. This failure has no doubt contributed to the instances of physical abuse that the evidence has shown to occur within some of these facilities.

In the Court's view, the defendants' own admissions have established their liability. That the system's outrageous deficiencies may be the result of staff shortages and excessive caseloads is no help to defendants, whose knowledge of these problems and refusal to take action confirm that the problems are not isolated incidents, but amount to "a persistent, pervasive practice." The behavior of the defendants also confirms that the decisions made by officials within the DHS have not been the result of the exercise of professional judgment. Plaintiffs' experts, whose testimony was uncontroverted, established that the District has failed to comply with reasonable professional standards in almost every area of its child welfare system. The testimony of defendants' own witnesses, several of which are named as defendants, often did little more than support this conclusion. Their candidness in admitting the system's failures makes it all the more clear that these failures are not the result of choosing among several professionally acceptable alternatives. These failures are the result of making no choices at all.[30]

Under *Youngberg*, if defendants have exercised professional judgment in carrying out their constitutional duties, the Court is to balance plaintiffs' liberty interests against any relevant state interests. In this case, however, the Court has determined that defendants have failed to exercise professional judgment almost as egregiously as they have failed to carry out their constitutional duties. Because of this, defendants' arguments about fiscal constraints are unavailing. The Court is well aware of the District's financial plight, but this cannot relieve the District of liability for depriving the children in its foster care of their constitutionally protected liberty interests.

The Court also concludes that plaintiffs have established the causal link between defendants' constitutional violations and the injuries suffered by the District's foster care children. The testimony and reports of Dr. Stein and plaintiffs' other experts demonstrate that most of the children in foster care will acquire or exacerbate permanent psychological disorders such as the "Attention Deficit Hyperactivity Disorder" exhibited by each of the named plaintiffs who was examined. The case histories of the named plaintiffs reveal the emotional harm these children have suffered, to the point of attempting suicide, by virtue of the failure of the system to either reunite them with their families or find them adoptive families who will care for them. The case histories also reveal the physical abuse these children have endured by virtue of the system's failure to provide for

**30.** The Court notes that although it has applied the professional judgment standard to this case, the result would have been the same had it used the deliberate indifference standard. The evidence clearly establishes that the Barry Administration was aware since at least 1987 of the serious deficiencies in the child welfare system. Despite this knowledge, the administration did virtually nothing to improve the dire situation within the CFSD. The former mayor was warned that children were at risk due to the lack of social workers and the excessive caseloads those workers handled. At the time of trial, the CFSD was still barely over half-staffed and social workers still carried caseloads well in excess of professional standards and the division's own policy. The former mayor was warned that the CFSD lacked an information system capable of tracking the number and location of children in its care. At the time of trial, the CFSD had no new system capable of

tracking this essential information. The former mayor was informed that the District was losing millions in federal financing due to administrative and procedural shortcomings. At the time of trial, the CFSD had not instituted any program for maximizing federal revenues and continued to forgo millions in federal reimbursements. The list could go on and on, with each of the District's shortcomings representing another failure in its duty to protect the children in its care. The lack of action by the Barry Administration to remedy the system's defects and properly provide for the plaintiff children represents no less than deliberate indifference toward the constitutional rights of these children. That the new mayor and her administration may have the intent to institute reforms cannot alter this conclusion unless that intent is transformed into concrete action or, at the very least, a concrete plan for action.

their safety. This is not a case of attempting to protect plaintiffs' interests and failing; this is a case where all too often no attempt is ever made.

The Court views the evidence in this case as nothing less than outrageous. The District's dereliction of its responsibilities to the children in its custody is a travesty. Although these children have committed no wrong, they in effect have been punished as though they had. Based on the foregoing, the Court holds that defendants have deprived the children in the District's foster care of their constitutionally protected liberty interests in violation of § 1983.

## IV.

### CONCLUSION

The Court has thoroughly reviewed the evidence before it and has carefully examined the law. Whatever the limits of the District's ability to provide for the children in its custody, it is clear that the District is statutorily and constitutionally compelled to do more than it is doing now. For these reasons and all of the reasons in the preceding discussion, the Court holds that defendants have violated § 1983 of Title 42 of the United States Code by depriving plaintiffs of their statutorily and constitutionally conferred rights.

### ORDER

In accordance with the Memorandum Opinion issued herewith and for the reasons set forth therein, it is this 18th day of April, 1991,

ORDERED that the defendants are hereby adjudged liable under 42 U.S.C. § 1983 for violating the federal and local statutory rights of all of the children in the plaintiff class and for violating the constitutional rights of those plaintiffs in the District of Columbia's foster care custody; and it is

FURTHER ORDERED that there shall be a status conference on May 10, 1991, at 9:15 a.m., in Courtroom 9, for the purpose of discussing the relief phase of this case. Prior to the status conference, the parties shall make a good faith effort to prepare a joint proposed schedule for resolving the final phase of this case.